## HEGNESS v. CHILBERG.

(Circuit Court of Appeals, Ninth Circuit. May 10, 1915.)

No. 2523.

1. CONTRACTS ⬦⬌132—LEGALITY OF OBJECT—PARTNERSHIP TO BID FOR MAIL CONTRACTS.

A contract of partnership to bid for certain mail contracts, and if obtained to carry out the same and divide the net profits on an agreed percentage basis, is not illegal as against public policy, where it does not appear that its purpose or effect was to prevent or lessen competition in bidding.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 659–661; Dec. Dig. ⬦⬌132.]

2. CONTRACTS ⬦⬌113—MAIL CONTRACTS—VALIDITY—PARTNERSHIP.

Such a contract is not invalid for fraud merely because it provides that the bids shall be made and the contracts taken in the name of one only of the partners.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 521–541; Dec Dig. ⬦⬌113.]

3. UNITED STATES ⬦⬌71—GOVERNMENT CONTRACTS—PROHIBITION OF TRANSFER.

Rev. St. § 3737 (Comp. St. 1913, § 6890), which prohibits the transfer of any government contract or any interest therein by the party to whom such contract is given to any other party, under penalty of annulment of the contract "so far as the United States are concerned," is for the protection of the United States only, and does not affect the rights of the parties to any such transfer.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 54; Dec. Dig. ⬦⬌71.]

4. UNITED STATES ⬦⬌111—ASSIGNMENT OF CLAIM AGAINST UNITED STATES—VALIDITY.

A contract of partnership to bid for a mail contract in the name of one partner and to carry out the same, if obtained, is not invalid under Rev. St. § 3477 (Comp. St. 1913, § 6383), as an assignment of a claim against the United States because of a provision therein requiring the partner in whose name the contract was to be taken to indorse the warrants received and deliver the same to the other partner.

[Ed. Note.—For other cases, see United States, Cent. Dig. §§ 94–98; Dec. Dig. ⬦⬌111.]

Ross, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Second Division of the District of Alaska; J. R. Tucker, Judge.

Suit in equity by Eugene Chilberg against John Hegness. From orders granting a preliminary injunction and appointing a receiver, defendant appeals. Affirmed.

The appellee, who was the plaintiff in the court below, brought a suit against the defendant for an accounting of the business of a partnership which was formed by written agreement between the parties as follows:

"Memorandum of agreement made and entered into this 25th day of August, 1909, by and between Eugene Chilberg, of Nome, Alaska, party of the first part, and John Hegness, also of Nome, Alaska, party of the second part, witnesseth:

"That, whereas, the parties hereto are desirous of securing mail contract to carry the United States mail between Nome, Alaska, and Unalakleet, Alaska,

⬦⬌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and are desirous of bidding upon proposal route No. 78136 and proposal route No. 78137, in the name of the party of the second part; and

"Whereas, the parties are desirous of forming a copartnership for the purpose of operating the said mail routes, or either of them, should the said contracts be obtained, and are desirous of evidencing the terms of their said copartnership in writing:

"Now, therefore, for and in consideration of the mutual promises and other good considerations, it is agreed between the parties hereto as follows:

"First. That each of the parties hereto shall endeavor so far as he can to obtain the said contracts above mentioned, or either of them, and to that end the party of the first part agrees to advance all necessary funds needed for such purposes, and to obtain the bond required in the proposals for said mail routes, and, if either or both of said contracts are secured, party of the first part agrees to furnish the necessary bond required by the government therefor, and to advance the necessary money to begin and operate the said mail route or routes under the said contract or contracts until the payments are made by the government according to the contract or contracts.

"Second. Party of the second part agrees to furnish his own dog team, sled, and equipment, and give his personal service as a carrier on said route or routes, and shall reside, when not on the mail route, in the town of Nome, and give his personal attention and supervision to the fulfillment and carrying out of said contract or contracts, if the same is obtained in his name as bidder.

"Third. That the party of the second part shall receive the same compensation for his personal services for his attention to the said work as the other carriers employed by this partnership, and shall receive in addition thereto fifteen per cent. (15%) of the net profits derived or made from the said contract or contracts, after all other expenses are paid.

"Fourth. That the party of the first part for his share shall receive eighty-five per cent. (85%) of the net profits derived or made from the said contract or contracts, after all expenses are paid for operating the same.

"Fifth. That all warrants issued and delivered by the government in payment under the said contract or contracts shall be signed by the party of the second part and delivered to the party of the first part, or his representative or agent, who shall keep a strict and accurate account of the same and act as treasurer of the partnership.

"In witness whereof, the said parties hereto have hereunto set their hands and seals the day and year first above written.

"[Signed]    Eugene Chilberg.    [Seal.]
"[Signed]    John Hegness.    [Seal.]

"Signed, sealed, and delivered in the presence of:
"[Signed]    William A. Gilmore.
"[Signed]    Mabel Searl."

The complaint alleged that the contract was obtained for carrying mail between Unalakleet and Nome, Alaska, for a period of four years, at the rate of $16,000 per year, and alleged that the defendant had retained, and was threatening to retain, more than his share of the money paid and to be paid by the government. The plaintiff prayed for an accounting and for an order restraining and enjoining the defendant from secreting or cashing any of the warrants thereafter received by him from the United States in payment on the mail contract until the final hearing and determination of the suit. The defendant demurred to the complaint, and affidavits were filed by both parties. A restraining order was obtained as prayed for, and thereafter an order was made appointing a receiver, with authority to demand, receive, and hold, subject to the further order of the court, all postal warrants received in payment for services rendered under the mail contract, or warrants thereafter received, and that all such warrants be delivered to the receiver. From the restraining order, and from the order appointing the receiver, the defendant appeals.

G. J. Lomen, of Nome, Alaska, and Ira D. Orton and Thomas R. Lyons, both of Seattle, Wash., for appellant.

William A. Gilmore, of Seattle, Wash., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVER-TON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] The defendant contends that the contract of partnership which is sued upon is against public policy and void, for the reason that it tends to prevent or diminish competition. The defendant relies upon the decision of this court in Hoffman v. McMullen, 83 Fed. 372, 28 C. C. A. 178, 45 L. R. A. 410, affirmed by the Supreme Court in 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117, and Atcheson v. Mallon, 43 N. Y. 147, 3 Am. Rep. 678. In Hoffman v. McMullen this court held that a contract to prevent competition and bidding for public works is contrary to public policy and cannot be enforced. The court said:

"The rule is universal that agreements which, in their necessary operation upon the action of the parties, tend to restrain their natural rivalry and competition, and thus to result in the disadvantage of the public or third parties, are against the principle of sound public policy, and are void."

And the Supreme Court said:

"It might readily be surmised that, if these parties had bid in competition, one or both of the bids would have been lower than their combined bid."

The law as applied to contracts to carry the mails is expressed in section 3950, Rev. Stats. (Comp. St. 1913, § 7437), which provides:

"No contract for carrying the mail shall be made with any person who has entered, or proposed to enter, into any combination to prevent the making of any bid for carrying the mail, or who has made any agreement, or given or performed, or promised to give or perform, any consideration whatever to induce any other person not to bid for any such contract."

1. The statute and the decisions in Hoffman v. McMullen and Atcheson v. Mallon would be applicable and controlling here, if there were any evidence in the case tending to show that the contract between the plaintiff and the defendant had a tendency to prevent competition in bidding. But there is no evidence, either in the contract or elsewhere in the record, that the plaintiff ever at any time contemplated bidding for the mail contract, or would have made a bid, or ever thought of making a bid, on his own behalf. Nor is there any fact or circumstance from which such a purpose on his part might be inferred. If any inference is to be drawn from the evidence and from the circumstances, it is that the plaintiff would not have applied for the contract for himself alone. He was a banker, a man of means, and it is not to be supposed that he would think of undertaking to contract to carry mail between Nome and Unalakleet through the winter months. In Hoffman v. McMullen this court said:

"There is no valid objection to such voluntary combinations, if the joint action of the parties is done honestly and in good faith. In all contracts secured in such a manner, the courts should never hesitate to protect parties in their agreements with each other, and compel them to comply with the terms thereof. It is only where the facts and circumstances surrounding the case clearly show that illegal means or improper and deceptive influences and methods were used to procure the contract that the maxim 'in pari delicto' applies."

In 9 Cyc. 492, it is said:

"On familiar principles, an agreement that one should bid for several for a public contract is not illegal per se."

In Bellows v. Russell, 20 N. H. 427, 51 Am. Dec. 238, it was held that an agreement that one shall bid for several for a mail contract is not void, unless made for some illegal purpose affecting public policy. We agree with the conclusion of the court below, which is thus stated in the opinion:

"The contract here shows on its face nothing more or less than an agreement that the parties shall endeavor to obtain a contract for carrying the mail in Alaska, and that they shall divide the net profits upon an agreed percentage basis, after the objects of the contract are completed, and after the money due on same is paid by the United States. There is no suggestion of a purpose to lessen the bids, nor is that the effect or tendency of the contract."

2. Nor is there anything in the case to show that the contract contemplated that the plaintiff would, or that he ever did, employ funds in any improper way, or exert influence in any improper manner to obtain the contract. It is not seen how it was possible to use money or exert influence for that purpose. The contract was necessarily and according to law let to the lowest bidder. The case differs totally from Tool Co. v. Norris, 2 Wall. 45, 17 L. Ed. 868, cited by the defendant. That was a case in which the contract was not let to the highest bidder, but was obtained by personal solicitation. The Civil War having just begun, the government was in need of arms. The Tool Company was a manufacturer of arms. Norris set to work to concentrate influence upon the War Department. He got senators to go with him to the War Office. By one means and another he got influential introduction to the Secretary of War, and secured the contract. There was nothing of that kind in the present case. The agreement provided that each party should endeavor to obtain the mail contract, and to that end the plaintiff agreed to advance all necessary funds and to obtain the bond; and although he alleged in his complaint that the contract was secured through his efforts, and without any aid or assistance from the defendant, and that he obtained and furnished the bond required by the government of the United States, and advanced the necessary money and made such financial arrangements that he and the defendant were able to and did comply with the terms and conditions of the said contract, it nevertheless does not appear, and it is not shown, that the agreement contemplated, as preliminary to engaging in the mail carriage contract, that the plaintiff should expend any sum of money, except such as might be necessary to obtain the bond. The evidence shows that he did this at a cost of $1,200.

[2] 3. Nor is there anything in the case to show that the plaintiff is not entitled to recover for the reason that his connection with the mail contract was concealed. There is no evidence that it was agreed that it should be concealed. The contract does not so provide, nor is there anything in the record to indicate that such was the intention. On the other hand, the agreement was openly signed in the presence of two witnesses, and one of the affidavits states that the post office of-

ficials were aware of the plaintiff's connection with the mail contract. There was nothing fraudulent in the mere fact that the agreement contemplated that the mail contract should be taken in the name of the defendant. A considerable sum of money was needed to finance the mail contract, and this the plaintiff agreed to furnish, while the defendant agreed to do the work. The fact that the plaintiff was to receive 85 per cent. of the net profits, and the defendant 15 per cent. is not ground for setting aside the orders appealed from. As a matter of fact, so far as the facts are shown, the stipulated division of the profits does not seem to have been inequitable. A large portion of the gross profits was received by the defendant in the way of wages, thereby reducing the sum of the net profits to be divided. The contract was to carry the mails only during the winter months, from November to May, inclusive. The first year the defendant received $3,600 as his wages; the second year, $3,600; and the third year $3,675; and at the end of that year it is said that he appropriated the additional sum of $1,800, claiming it as extra compensation. The sums advanced by the plaintiff to carry out the contract during those years ranged from $10,833 to $14,000 each year.

4. There is no evidence that either the plaintiff or the defendant violated any of the regulations of the Post Office Department. Counsel for the defendant refers to the new postal laws and regulations of 1913, issued under the act of Congress approved August 24, 1912 (37 Stat. 539, c. 389), in which, in section 1414, it is provided that proposals for carrying the mails shall be made on forms prescribed by the Postmaster General, and he states in his brief that the forms prescribed under that authority contain the following, to which the bidder must certify:

"This proposal is made in my own interest, and not by me as the agent of any other person or company, with full knowledge of the distance of the route, the weight of the mail to be carried, and all other particulars with reference to the route and service, and also upon careful examination of the instructions attached to said advertisement."

And he argues that the defendant must have signed such a certificate, and that therefore the contract he made with the plaintiff was in violation of the postal rules and regulations. To this there are two answers:

First. It nowhere appears in the record that the defendant signed such a certificate. What were the rules and regulations in force in 1909 is not shown. Nor do the postal laws and regulations of 1913 contain any specification of such a form to be signed by bidders. All that the volume contains on that subject is the statute of the United States (18 Stat. 235 [Comp. St. 1913, § 7433]), which provides that no proposal shall be considered unless—

"there shall have been affixed to said proposal the oath of the bidder, taken before an officer qualified to administer oaths, that he has the ability, pecuniarily, to fulfill his obligations, and that the bid is made in good faith, and with the intention to enter into contract and perform the service in case his bid is accepted."

If anything in the proposal which the defendant signed stands in the way of the plaintiff's right to recover in this suit, it has not yet

been shown in the record, and for that reason, if there is anything in the proposal that affects the controversy, its consideration should await the final hearing on the merits.

Second. But, even if it should be shown that the defendant signed the certificate which the defendant quotes, there is nothing in the facts to impeach its verity; for it was true that the proposal was made by the defendant in his own interest, and not by him as the agent of any other person or company.

5. The contract between the parties is not void by virtue of section 3963 of the Revised Statutes (Comp. St. 1913, § 7451), which provides that:

"No contractor for transporting the mails within or between the United States and any foreign country shall assign or transfer his contract, and all such assignments or transfers shall be null and void."

There is in this case no assignment or transfer of the mail contract. It remained at all times in the name of the original bidder, and for the benefit of the partnership. The statute prohibits only the transfer of a mail contract that has been made and entered into.

[3] 6. Nor is the contract made void by section 3737, which prohibits the transfer of any government contract or order or any interest therein "by the party to whom such contract or order is given, to any other party," and provides that:

"Any such transfer shall cause the annulment of the contract or order transferred so far as the United States are concerned."

That statute is for the protection of the United States only, and does not affect the rights of the parties to such a transfer. Dulaney v. Scudder, 94 Fed. 6, 36 C. C. A. 52; Goodman v. Niblack, 102 U. S. 560, 26 L. Ed. 229.

[4] 7. Nor is the reversal of the order of the court below required by the provisions of section 3477, which prohibits the transfer or assignment of any claim upon the United States, unless the assignment is executed and attested in the manner prescribed in the section, and after the allowance of the claim and the issuance of the warrant. It is contended that this statute is violated by two provisions of the partnership contract: First, in that it provides that all warrants issued and delivered by the government in payment under the mail contract shall be signed by the defendant and delivered to the plaintiff; second, in that the agreement makes the plaintiff the owner of a large interest in the mail contract.

In answer to the first proposition, it is sufficient to say, so far as the case here on appeal is concerned, that if it be conceded that the provision in the agreement for the indorsement of the warrants from the defendant to the plaintiff is void, it does not make void the entire contract. It is still a valid partnership agreement, calling for division of profits in the proportions therein specified, and the case comes within the principle announced in Nutt v. Knut, 200 U. S. 12, 26 Sup. Ct. 216, 50 L. Ed. 348, in which the court gave effect to a similar agreement, and said:

"Such an agreement did not give the attorney any interest or share in the claim itself, nor any interest in the particular money paid over to the claim-

ant by the government. It only established an agreed basis for any settlement that might be made, after the allowance and payment of the claim, as to the attorney's compensation. It simply created a legal obligation upon the part of the estate, which, if not recognized after the collection of the money, could have been enforced by suit for the benefit of the attorney, without doing violence to the statute or to the public policy established by its provisions."

Such being the equitable right of the plaintiff, the court below did not abuse discretion in enjoining, pendente lite, the defendant from secreting or disposing of the postal warrants, or sending the same without the jurisdiction of the court. In National Bank of Commerce v. Downie, 161 Fed. 839, 843, 88 C. C. A. 657, 661, this court said:

"Hence, where a claim has been allowed by the accounting officers of the United States, a warrant issued therefor and delivered to the claimant, the government is no longer concerned with his disposition of the draft, or the funds which it represented"—citing York v. Conde, 147 N. Y. 486, 42 N. E. 193, and Farmers' National Bank v. Robinson, 59 Kan. 777, 53 Pac. 762.

Second. The provision of the agreement by which the plaintiff is given an interest in the profits of the mail contract is not an assignment of a claim against the United States. Hobbs v. McLean, 117 U. S. 567, 6 Sup. Ct. 870, 29 L. Ed. 940, is decisive of that question. In that case, in considering the effect of section 3477, the court said:

"When the contract of partnership was made, Peck had no claim which he could present for payment, or on which he could have brought suit. He therefore had no claim the assignment of which the statute forbids. It is so clear that the articles of partnership do not constitute such an assignment as is forbidden by the section under consideration that it would be a waste of words further to discuss the point."

The orders are affirmed.

ROSS, Circuit Judge (dissenting). This is a suit in equity brought upon a written instrument which is as follows:

"Memorandum of agreement made and entered into this 25th day of August, 1909, by and between Eugene Chilberg, of Nome, Alaska, party of the first part, and John Hegness, also of Nome, Alaska, party of the second part, witnesseth:

"That, whereas, the parties hereto are desirous of securing mail contract to carry the United States mail between Nome, Alaska, and Unalakleet, Alaska, and are desirous of bidding upon proposal route No. 78136 and proposal route No. 78137, in the name of the party of the second part; and

"Whereas, the parties are desirous of forming a copartnership for the purpose of operating the said mail routes, or either of them, should the said contracts be obtained, and are desirous of evidencing the terms of their said copartnership in writing:

"Now, therefore, for and in consideration of the mutual promises and other good considerations, it is agreed between the parties hereto as follows:

"First. That each of the parties hereto shall endeavor so far as he can to obtain the said contracts above mentioned, or either of them, and to that end the party of the first part agrees to advance all necessary funds needed for such purpose, and to obtain the bond required in the proposals for said mail routes, and, if either or both of said contracts are secured, party of the first part agrees to furnish the necessary bond required by the government therefor, and to advance the necessary money, to begin and operate the said mail route or routes under the said contract or contracts until the payments are made by the government according to the contract or contracts.

"Second. Party of the second part agrees to furnish his own dog team, sled, and equipment, and give his personal service as a carrier on said route or routes, and shall reside, when not on the mail route, in the town of Nome, and give his personal attention and supervision to the fulfillment and carrying out of said contract or contracts, if the same is obtained in his name as bidder.

"Third. That the party of the second part shall receive the same compensation for his personal services for his attention to the said work as the other carriers employed by this partnership, and shall receive in addition thereto fifteen per cent. (15%) of the net profits derived or made from the said contract or contracts, after all other expenses are paid.

"Fourth. That the party of the first part for his share shall receive eighty-five per cent. (85%) of the net profits derived or made from the said contract or contracts, after all expenses are paid for operating the same.

"Fifth. That all warrants issued and delivered by the government in payment under the said contract or contracts shall be signed by the party of the second part and delivered to the party of the first part, or his representative or agent, who shall keep a strict and accurate account of the same and act as treasurer of the partnership.

"In witness whereof, the said parties hereto have hereunto set their hands and seals the day and year first above written.

"[Signed]  Eugene Chilberg.  [Seal.]
"[Signed]  John Hegness.  [Seal.]

"Signed, sealed, and delivered in the presence of:
"[Signed]  William A. Gilmore.
"[Signed]  Mabel Searl."

The bill alleges, among other things, that thereafter the complainant and the defendant obtained, in the name of the defendant, the United States mail contract for carrying the mail between the points named, for a period of four years, for the sum of $16,000 a year; that the contract was secured under the terms of the said agreement through the efforts of the complainant, and without any aid or assistance from the defendant, and that the complainant furnished the bond required by the government, and advanced the money necessary to enable the complainant and defendant to comply with the terms of the said contract throughout its term; that immediately after the contract was obtained the complainant and defendant agreed that the Pacific Cold Storage Company, a corporation doing business at Nome, Alaska, should act as the agent and treasurer of the complainant and defendant, and as their auditor, and should receive all warrants from the government, to be properly indorsed by the defendant, and should pay all of the bills against the alleged copartnership, and render an accounting to the complainant and defendant at the end of each mail season in accordance with the terms of the alleged agreement; that thereafter the defendant took charge of the delivery of the mails under the contract, and in addition to carrying the regular amount of mail imposed by the weight limit of the said mail contract, the defendant, using the carriers, teams, equipment, and credit of the alleged copartnership, carried excess mail amounting to several thousand dollars, for which he refuses to account; that in or about the month of June, 1913, the defendant, in violation of the alleged agreement, indorsed one of the warrants issued by the government in the sum of $3,406.11, and instead of depositing the same with the Pacific Cold Storage Company, cashed it at a bank in Nome, and from the proceeds thereof took the sum of $1,800, and subsequently, and in the month of May, 1914, drew from the Pacific Cold

Storage Company $600, claiming that amount to be due him, in, violation of the alleged agreement; that the said mail contract had been completed, and that there remained due from the government to the alleged copartnership for services rendered during the then past year $9,551.55, besides a large amount for carrying excess mail during that year, all of which would soon be paid by the government in warrants made payable to the order of the defendant; that the alleged copartnership remained indebted to the Pacific Cold Storage Company in about the sum of $8,500, for advances made by it during the then past year, and that the defendant had admitted taking $2,400 during that year in excess of what was due him under the terms of the alleged agreement, and threatened to appropriate to his own use all warrants received from the government for excess mail carried during the four year term, and otherwise violated the terms of the alleged copartnership, and is wholly insolvent and unable to respond to any judgment that the complainant might recover against him. The prayer of the bill was for an accounting, and for a restraining order and injunction, and such other relief as might be proper.

A demurrer to the bill was overruled by the court below, after which the defendant filed an answer thereto, in which, while admitting the execution, set up the invalidity, of the alleged agreement between him and the complainant upon various grounds therein stated, and, among other things, alleged therein that before and at the time of the making of the alleged agreement between the complainant and the defendant the former was negotiating with one Chester, who was a man of means, and represented to the latter that he (complainant)—

"was in favor of bidding for such contract to carry the mails aforesaid under contract with said plaintiff, or said Chester, or both, then and there knowing that defendant would also be a bidder for such contract; that defendant had no knowledge of said negotiations of plaintiff and said Chester at the time of making said pretended agreement with plaintiff; that plaintiff at all times before entering into said agreement, to wit, said paper writing set forth in the complaint, enjoined the defendant and demanded of him absolute secrecy in regard to their negotiations, and failed and neglected to inform the said Chester of the negotiations pending between himself and defendant, intending then and there to cause said Chester to neglect bidding for said mail contract and for the purpose of stifling the bids for said contract and preventing competition in the bidding therefor; that by reason of the premises the said H. S. Chester and said plaintiff, so defendant is informed and believes, did in fact neglect to bid for said mail contract or contracts, and the bidding for said contract was thereby in fact stifled, and the government of the United States was thereby in fact deprived of competition in the bidding for said contracts to carry mail, and prevented from knowing that a stranger to the contract, to wit, said plaintiff, was also interested in said mail contract awarded to the defendant."

The answer contained various other allegations, admissions, and denials. On the filing of the bill, together with an affidavit of the complainant's attorney, the court made an order directing the defendant to show cause why a restraining order should not be granted, and subsequently granted an injunction pendente lite, and thereafter, on motion of the complainant, made an order appointing a receiver in the cause, from which orders the present appeals are taken.

I am unable to take the view of the agreement upon which the

suit is based that was taken by the court below and that is taken by the majority of this court. It is declared by statute that:

"All contracts for carrying the mail shall be in the name of the United States, and shall be awarded to the lowest bidder tendering sufficient guarantees for faithful performance," etc. R. S. § 3949 (Comp. St. 1913, § 7436).

And section 3963 of the same statutes (section 7451) reads as follows:

"No contractor for transporting the mail within or between the United States and any foreign country shall assign or transfer his contract, and all such assignments or transfers shall be null and void."

There may be nothing in the statutes nor in public policy which would have prevented the complainant and the defendant from forming a partnership and openly making a joint bid for carrying the mail. In McMullen v. Hoffman, 174 U. S. 639, 652, 19 Sup. Ct. 839, 844 (43 L. Ed. 1117), the Supreme Court quoted with approval this from the opinion of Judge Folger in Atcheson v. Mallon, 43 N. Y. 147, 151, 3 Am. Rep. 678:

"But a joint proposal, the result of honest co-operation, though it might prevent the rivalry of the parties, and thus lessen competition, is not an act forbidden by public policy. Joint adventures are allowed. They are public and avowed, and not secret. The risk, as well as the profit, is joint, and openly assumed. The public may obtain at least the benefit of the joint responsibility, and of the joint ability to do the service. The public agents know, then, all that there is in the transaction, and can more justly estimate the motives of the bidders, and weigh the merits of the bid."

And the Supreme Court added:

"We have here nothing to do with a combination of interest which is open and avowed, which appears upon the face of the bid and which is therefore known to all. Such a combination is frequently proper, if not essential, and, where no concealment is practiced and the fact is known, there may be no ground whatever for judging it to be in any manner improper."

In the case in hand, however, there was nothing open and aboveboard in the dealings with the government, but, on the contrary, there was concealed from it the fact, appearing upon the very face of the bill in the present suit, that the bid for carrying the mails, while made in the name of Hegness, was in truth made mainly in the interest of one who was to receive 85 per cent. of the net profits of the undertaking, and who had agreed "to advance all necessary funds needed" for the procuring of the contract or contracts, the "necessary money to begin and operate the said mail route or routes under the said contract or contracts, until the payments are made by the government according to the contract or contracts," as well as to furnish the required bond to the government.

It is, in my opinion, wholly unimportant whether the agreement entered into between the complainant and the defendant was or was not detrimental to the government. If its natural tendency was to injuriously affect the public interests, it was against public policy and void. That is the well-established law. The case of Hoffman v. McMullen, 83 Fed. 372, 28 C. C. A. 178, 45 L. R. A. 410, in this court—afterwards affirmed by the Supreme Court, 174 U. S. 639, 19 Sup. Ct.

839, 43 L. Ed. 1117—was in principle quite similar to this. There the city of Portland, through its water committee, having advertised for bids for the construction of a pipe line, Hoffman and McMullen entered into an agreement by which Hoffman put in a bid for the work in the name of Hoffman & Bates, and McMullen put in a higher one in the name of the San Francisco Bridge Company. The contract having been awarded to Hoffman & Bates, that firm and McMullen entered into a partnership agreement by which each party to it should pay one-half of the cost of executing the contract and receive one-half of the profits or bear one-half of the loss resulting therefrom. The contract having proved profitable, Hoffman refused to account to McMullen for any part of the profits, and in the suit brought by the latter against the former therefor the agreement was held by this court, as well as by the Supreme Court, against public policy and absolutely void. A large number of authorities were cited by both courts in that case, and it is useless to again cite them here.

It is true that in the present case only one bid was made, while there two actually fraudulent bids were submitted. Here, however, the direct tendency of the agreement and of the actions of the parties was to prevent competitive bids, and to thus injure the interests of the government, besides which there was a concealment and fraud practiced upon it in misrepresenting the actual bidder and in evading and violating the statutory provisions of the government, if not its postal regulations, which have the force and effect of law. Moreover, the provisions in the agreement of these parties that Chilberg, in the event the bid made in the name of Hegness should be accepted, was to furnish the necessary bond, "advance the necessary money to begin and operate the said mail route or routes under the said contract or contracts until the payments are made by the government according to the contract or contracts," was to receive 85 per cent. of the net profits resulting therefrom, and was "to advance all necessary funds needed" for procuring the contract or contracts, are very significant and suspicious. I find it difficult to understand how any funds should be needed to procure a contract which the law expressly requires shall be let to the lowest bidder, beyond the trifling cost of putting in the bid. In my opinion the case is one which a court of equity should not entertain, and, accordingly, that the orders appealed from should be reversed, and the court below directed to sustain the demurrer to the bill and dismiss the suit, at the cost of the complainant. See Tornanses v. Melsing et al., 109 Fed. 710, 47 C. C. A. 596.