(80 South. 31)

ANDERSON et al. v. BLAIR. (3 Div. 849.)

(Supreme Court of Alabama. June 20, 1918. Rehearing Denied Nov. 14, 1918.)

1. CONTRACTS �köm123(1)—VALIDITY—PUBLIC POLICY.

Public policy condemns agreements which tend injuriously to affect the public service.

2. CONTRACTS �köm123(1)—VALIDITY—PUBLIC POLICY.

Agreement between plaintiffs and defendant to use joint and individual efforts and legitimate influence to obtain from the United States government contract for construction of a military camp *held* not against public policy.

3. CONTRACTS �köm123(1)—VALIDITY—PUBLIC POLICY.

If agreement between plaintiffs and defendant to use joint efforts to obtain from the United States government contract for construction of a military camp, by necessary implication, tended to bring to bear upon officers of the government secret or improper influences, it must be condemned.

4. CONTRACTS �köm108(1)—VALIDITY—PUBLIC POLICY.

Those rules which say that a given contract is void as against public policy are not to be extended arbitrarily.

5. UNITED STATES �köm71—CONTRACT TO CONSTRUCT MILITARY CAMP—VALIDITY.

Agreement between plaintiffs and defendant to use joint efforts to obtain from the United States government contract for construction of a military camp, and to contribute to services and share in profits, after contract has been procured, was not in violation of U. S. Comp. St. 1916, § 6890, as to transfer of contract by party to whom it is given causing annulment.

6. JOINT ADVENTURES �köm1—INDEFINITE CONTRACT—ENFORCEMENT.

Contract between plaintiffs and defendant to obtain for defendant from the United States government a contract for construction of a military camp, the parties to contribute services and share in profits, *held* not too indefinite to support judicial action.

Appeal from Circuit Court, Montgomery County; Gaston Gunter, Judge.

Bill by I. O. Anderson and others against Algernon Blair for a receiver, and to enforce the performance of a contract, and an accounting. From a judgment sustaining demurrers to the bill, complainants appeal. Reversed and remanded.

The allegations are in effect that orators and said Blair made and entered into an agreement, by the terms of which they jointly and collectively agreed that they would use their joint and individual efforts and legitimate influence to obtain from the United States government a contract for the con-

struction of a military camp near the city of Montgomery, Ala., which was then in contemplation by said government, and to have same entered into by and between said government on the one part, and said Blair on the other, and, upon procuring the award of said contract, to perform same by the contribution of such of the services, equipment, and organization of said parties, as might be deemed advantageous to the ends sought by the government, and to share in the profits, gains, or commissions arising therefrom; that it was understood that said contract would require the construction of a large number of buildings, the laying of extensive water mains and pipes, and many other things calling for the services and equipment of experienced builders and contractors capable of handling large contracts in the most expeditious manner, and involving a very large amount then unknown, but now known to exceed $1,000,000; and that the contract would not be one to be let on competitive bids as to the price at which the same would be performed, but that it would be let with special reference to the ability of the contractor to enlist in the construction of said camp sufficient forces and equipment to build the same in the shortest possible time, for which compensation would be paid on a commission basis, that is to say, a percentage upon the amount expended by said contractor for the government, and under its supervision in the construction of said camp, which percentage was fixed and advanced by the government; that it was part of said agreement that all of said parties should use their combined efforts, not only to obtain such contract by all legal means, but also to use their services and equipment so far as possible in the performance of everything to be done thereunder, so that the government might get the best possible performance of said contract in the shortest possible time; and that all should participate in the amount received as commissions therefor.

Plaintiff alleges that it was part of their agreement that, as soon as a contract should be awarded to said Blair, he (Blair) should make a fair, equitable, and satisfactory apportionment of the proceeds thereof among the parties interested, and that, in the event any party was dissatisfied with the apportionment so made by him, such apportionment was to be determined by E. B. Joseph and F. J. Cramton; that, after the contract was awarded to said Blair by the officials of the United States government, the said Blair sought to repudiate his said agreement with complainant and it was only after their persistent insistence that he agreed to make any apportionment of the proceeds of said contract between them, but did so afterwards, but complainants, being dissatisfied with same, demanded that E. B. Joseph and F. J. Cramton should make an apportionment thereof in accordance with the agreement between the parties, which they did

after due notice to defendant Blair, and apportioned the proceeds of said contract as follows: Algernon Blair shall receive $1,500 per month, to be retained by him each month out of said sums before any of the provisions hereinafter set forth shall be made. The balance of said sum, after the deduction of said $1,500, shall be divided in the following proportions: Algernon Blair, 30 per cent.; F. J. Cramton, 25 per cent.; I. O. Anderson, 25 per cent.; James Hodgson, 5 per cent.; D. F. Gorrie & Sons, 5 per cent.; J. O. Estes, 5 per cent.; and Jeffers Brothers, 5 per cent.—of which apportionment, so made by said Joseph and Cramton, defendant Blair was duly notified prior to the filing of this bill. But said Blair has, notwithstanding the agreement above set out, refused and still refuses to recognize the same, and still ignores complainants.

It is then alleged that each of the orators, especially Cramton and Anderson, had made efforts and expended money in seeking to obtain the contract for himself, but after said agreement they withdrew their application and bended all their energies and efforts to have the contract awarded to Blair, and that one of complainants had been informed, by an assistant of the government official having such matters in charge, that said official had just approved the letting of a similar contract for the camp near Atlanta, Ga., to a man who was recommended by many other Atlanta contractors, who would assist in this performance and participate in the commissions to be paid thereunder, and that it was understood by said officials that it was advisable that said complainant and other Montgomery contractors get together and use their combined efforts to get the contract for the Montgomery camp in the name of one of them, and one of said complainants then and there informed said assistant that such a course would be pursued.

It is further alleged that, after the awarding of said contract to Blair, he immediately entered upon the performance thereof, without waiting for the formal contract to be executed, and had one or more of orators to assist him on some parts thereof, but, after the first day, put orators off from time to time when they offered to assist in the performance of said contract until the formal execution of the contract between Blair and the United States government, and that after the formal execution of the contract said Blair began to contend that the character of said contract and the work to be done thereunder made it difficult, if not impossible, for him to use the services and equipment of complainants in the manner contemplated under the agreement among them, and sought to eliminate and to terminate said agreement by offering to pay to a few of complainants trivial amounts in settlement and satisfaction of the interest of complainants in said adventure, all of which were rejected by complainants, who insisted to said Blair

that he perform in full said agreement, and that as soon as complainants suspected that said Blair was trying to violate said agreement and deprive complainants of their interest therein, and before said contract between said Blair and the government was fully executed, they notified Col. I. W. Littell, the contracting officer making such contract on behalf of the government, on, to wit, July 26, 1917, and also the constructing quartermaster in charge of said camp construction of their interest in said contract, and of the agreement made by them and said Blair.

The bill also sets up that the work is progressing rapidly, and that Blair is collecting large sums from the government; that he is a man of moderate means (the bill setting out his property); and that a receiver is necessary to take charge of and receive the funds being received by him; that the court may enforce the contract and prevent orators from sustaining an irreparable loss.

Rushton, Williams & Crenshaw, Ball & Beckwith, Hill, Hill, Whiting & Stern, and Steiner, Crum & Weil, all of Montgomery, for appellants.

Horace Stringfellow and W. A. Gunter, both of Montgomery, for appellee.

SAYRE, J. In that aspect of it which needs now to be considered, this is a bill by appellants against appellee for an accounting of the profits earned by appellee in the construction of a cantonment for troops of the United States near the city of Montgomery. The facts alleged will appear in the reporter's statement of the bill as amended. Demurrer to the bill was sustained in the court below, and on this appeal two propositions are relied upon as sufficient, either of them, to sustain that ruling: (1) The alleged agreement between complainants (appellants) and defendant (appellee) was void as against public policy; and (2) said agreement was so indefinite in one of its terms as to be incapable of enforcement by judicial process.

[1] 1. Public policy is a phrase of exceeding great generality, and in every case needs definition with reference to the facts involved. Stated with a view to the field in which lies the contract under consideration, the rule of public policy condemns agreements which tend injuriously to affect the public service. Of this branch of the rule more or less familiar examples are found in contracts to use personal influence, as distinguished from professional services, to secure the nomination, election or appointment of any person to office and in agreements to procure legislation by personal solicitation, or—and this more nearly touches the question at hand—the favorable action of a public servant.

[2, 3] Nothing can be said against the nature of the joint adventure upon which, according to the bill, the parties agreed to embark their efforts and resources. The demurrer asserts that the method by which complainants agreed to assist appellee in obtaining the contract with the government was against public policy, and so that the joint adventure, which depended upon appellee's procurement of the contract, created no obligations on the part of any one. There is nothing in the literal terms of the agreement to mark it as illegal; but, if by necessary implication the agreement tended to bring to bear upon the officers of government secret or improper influences in awarding the contract to appellee, then it must be condemned. In Marshall v. Baltimore & Ohio R. R. Co., 16 How. 314, 14 L. Ed. 953, cited by appellee, the court said:

"Legislators should act from high considerations of public duty. Public policy and sound morality do therefore imperatively require that courts should put the stamp of their disapprobation on every act, and pronounce void every contract, the ultimate or probable tendency of which would be to sully the purity or mislead the judgments of those to whom the high trust of legislation is confided."

That on the facts stated by the court, was a clear case of a contract to corrupt the Legislature.

In Bush v. Russell, 180 Ala. 590, 61 South. 373, a case in which, on the facts pleaded, we refused to condemn a contract by which Russell agreed to pay Bush a fixed sum for services to be rendered by the latter in assisting the former in her efforts to sell to the government of the United States a lot in the city of Mobile for a post office site. In that case, saying we intended "no disparagement whatever of the salutary rule which is established by the authorities, that agreements for the procurement of favors from public officials in the discharge of public duties by personal solicitation or influence as considerations to be addressed to them over and above the merits of the action sought, or by any secret or devious approaches, are without the pale of remedial law because they tend to introduce inefficiency and corruption into the administration of government," we upheld the contract as pleaded for the reason that there was on its face no appearance of secrecy or deception to be practiced, no fraud or corruption contemplated—nothing to justify a judicial declaration that it was against fair dealing, good morals, or public policy.

[4] Another consideration which should not be ignored in cases of this character is thus stated by Sir George Jessel, M. R., in Printing Company v. Sampson, 19 L. R. Equity Cases, 462:

"It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice."

This, as said by the Supreme Court of Wisconsin in Houlton v. Nichol, 93 Wis. 393, 67 N. W. 715, 33 L. R. A. 166, 57 Am. St. Rep. 928, means no more than that it should be made to appear clearly—that is, beyond reasonable controversy—that the contract is void as contrary to law or sound morals, else it should be sustained.

Appellee lays stress upon the decision in Tool Co. v. Norris, 2 Wall. 45, 17 L. Ed. 868. In that case the court made use of this very broad expression:

"All agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy."

In Lyon v. Mitchell, 36 N. Y. 235, 93 Am. Dec. 502, Judge Hunt, afterwards on the bench of the Supreme Court of the United States, expressed the opinion that the Tool Company Case was not well considered, and in Bush v. Russell, supra, we indulged quotations from later decisions of the Supreme Court of the United States which very clearly demonstrated that the language of the Tool Company Case was too broad, and that it is legitimate to employ agents to lay before officers authorized to contract for government all such information as may apprise them of the character and value of the article offered, and enable them to act for the best interest of the country. Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539; Trist v. Child, 21 Wall. 441, 22 L. Ed. 623. Confining our observation to cases like that before us, the rule seems to be that agreements to procure government contracts by "lobbying," that is, by secret and corrupting influences, or by personal influence, are void as against public policy; but, where the contract evidences a purpose to engage in a fair business enterprise and there is no concealment of the agency, it is good and should be enforced. Parsons v. Trask, 7 Gray (Mass.) 473, 66 Am. Dec. 502, note. Or, to employ the language of the court in Houlton v. Nichol, supra:

"Unless the contract was for the performance of some act illegal per se, or to do something of itself of a corrupting tendency, or by its terms or by necessary implication it contemplated a resort to improper means, such as personal solicitation or influence, something other than an appeal to the reason of the department officers whose action was sought, or to obtain their action as a favor instead of as a right, it should be upheld."

Every case of this general character must depend upon its own facts and circumstances. The result in the particular case may very properly, we think, be made to turn upon the question whether it appears by the contract alleged, construed in the light of its circumstances, that complainants thereby corruptly or improperly made merchandise of their indorsement of appellee's fitness in character and ability to perform the work required by the government. It hardly needs to be said that this was not a contract to stifle bids; the government was not letting its contract in that way. Its plan was to select a contractor and let the work to him on a fixed commission. The contract was a big one, and the work needed to be done with utmost expedition. Honest co-operation, openly engaged in, could offend against no interest of the government. Gibbs v. Smith, 115 Mass. 592; Atcheson v. Mallon, 43 N. Y. 147, 3 Am. Rep. 678.

[5] It is said that the agreement between the parties was in violation of section 6890 of the Compiled Statutes of the United States (1916), which reads as follows:

"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned."

But it is plain enough that there was no transfer of a contract in this case, nor does it appear that there was any offense against section 6890, which was "passed in order that the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and a settlement made." Burck v. Taylor, 152 U. S. 634, 648, 14 Sup. Ct. 696, 701, 38 L. Ed. 578.

The contract in question contemplated that the government would deal with appellee alone but appellants were to assist in its execution—necessarily appellee would need help—and, if there is any force in our statement of the reason of the matter and its supporting authorities, this contract should have been performed by the parties. It is likewise clear that article 12 of the contract, upon which also appellee relies for his contention that appellants have no rights, was, in effect, nothing more than an affirmation of section 6890 of the Compiled Statutes. Its office in the contract and its effect upon the cause are therefore to be determined on the principles which in our judgment sufficed to answer the objections that this contract was prohibited by the statute.

It is clear upon the whole that appellee relies upon Tool Co. v. Norris, supra, and Egerton v. Brownlow, 4 H. L. Cases, 1–256, for some definitions of public policy which would cover the case shown by the bill. We are perfectly willing to agree that the contracts shown in both those cases were properly condemned. In the first a contract with the government was to be obtained by "personal influence," of that case in other respects we have said enough. In the other case there was in a will a limitation over of an estate upon condition that the beneficiary of the condition should obtain a peerage. A peerage at that time (1853) was a very important office in England. The Lord Chief Baron says that the framer of the will seemed to consider the peerage "as being a

bauble, the subject of bargain or barter, contract or condition, and to have forgotten that a peer is at once a legislator and an expounder of the statutes, that it is his office to frame and also to decide upon the law, and that he has, in the Constitution of this country, duties to perform of the greatest importance to the public welfare." After noting the fact that testator had endeavored to create a strong pecuniary interest to procure the renewal of peerage in his family, the Chief Baron said that it was "quite inconsistent with the public welfare, and even the public safety, that property should be bequeathed subject to conditions unnecessarily, capriciously, wantonly, and officiously introduced, and made to depend on any public act of state, whether the Crown, the Legislature, or any branch of it, or of the executive department." Lord Lyndhurst from whom appellee quotes, taking substantially the same view of the question of policy involved, observed that what cases come within the rule must be decided as they successively occur. We cannot go through the case (covering 256 pages of the report) about which the law lords seem to have had all sorts of opinions. Enough, perhaps, to say that the facts involved were vastly different from those in the case under consideration, and that, in every court, if a case varies from the facts and circumstances of preceding authorities, the court is at liberty to found a new decision on those circumstances. (Realty Investment Co. v. City of Mobile, 181 Ala. 184, 190, 61 South. 248. But we make no new rule, as the authorities to which we have referred abundantly show. In conclusion on this branch of the case as showing decisions upholding the validity of contracts involving quite similar elements, we cite Hegness v. Chilberg, 224 Fed. 28, 139 C. C. A. 492, and Valdes v. Larrinaga, 233 U. S. 705, 34 Sup. Ct. 750, 58 L. Ed. 1163.

[6] It is further urged that this contract was too indefinite to support judicial action, for that it provided that it was to be performed "by the contribution of such of the services, equipment and organizations of said parties as might be deemed advantageous to the ends sought by the government." It may be said, no doubt, of the great majority of contracts of joint adventure and of partnership, that they do not point out precisely what each party is to do under them. Such a provision is quite unusual, and, we should say, quite impossible in many cases. The law exacted of each of the parties the utmost good faith and fairness in the prosecution of the common enterprise (Saunders v. McDonough, 191 Ala. 119, 67 South. 591), while, as for a division of the profits to be earned that was to be determined, if necessary, by arbitration—a not uncommon method of determining such matters. We may add, if that be important, that the bill shows that before this suit was commenced arbitrators agreed upon in advance had apportioned among the parties their respective shares of the profits earned and to be earned in the performance of defendant's contract with the government.

On the facts alleged in the bill, considered with reference to the reason and spirit of the law as we have ascertained it from the modern authorities, we hold that the contract into which the parties entered was on its face a fair and lawful contract, and, for aught appearing, should be enforced by the court.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN and GARDNER, JJ., concur.