## MASON v. ROSE.

### No. 238, Docket 21299.

United States Court of Appeals Second Circuit.

Argued May 2, 1949.

Decided July 27, 1949.

Simpson, Thacher & Bartlett, New York City (Edwin L. Weisl, Richard B. Persinger and Marshall A. Jacobs, New York City, of counsel), for appellant.

Schwartz & Frohlich, New York City (Louis D. Frohlich, Arthur Karger and Arthur H. Schwartz, New York City, of counsel), for appellee.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

SWAN, Circuit Judge.

This action was commenced in the Supreme Court for the County of New

York and removed to the federal court on the ground of diverse citizenship. The plaintiff, James Mason, is an English actor of distinction and unique ability who has attained a high professional reputation in the United States as well as in England; the defendant is an experienced motion picture executive who is a citizen of the United States and resided in California when the action was commenced. With a view to engaging in a joint venture in the independent production of motion pictures, they signed in England, on or about June 5, 1946 the letter printed in the margin.[1] Shortly thereafter a controversy arose between them as to the legal effect of this letter. Mason claims that it was not intended to be a formal contract setting forth in full the terms of their undertaking but was to be supplemented by a further and more complete agreement. Rose contends that the letter itself is a binding contract. By the present action, commenced on March 5, 1947, Mason sought a declaration that the letter does not constitute a valid contract and also sought an injunction to restrain Rose from claiming rights thereunder and thereby interfering with Mason's efforts to obtain employment as a motion picture actor. The case came on for trial before Judge Knox without a jury. The trial judge held that the letter was not a valid contract because of its indefiniteness as to essential terms.[2] Judgment was given for the plaintiff, from which the defendant has appealed.

---

[1] "Claridge's
"Brock Street, W. 1
"5th June, 1946

"James Mason, Esq.,
"Olleberrie Farm,
"Belsize,
"Sarratt,
"Herts.

"Dear James:
"1. Confirming our agreement I will form an American Company before you go to America next fall for the purpose of producing films starring yourself. The shares of this Company are to be divided equally between us, i.e. 50% to you and 50% to me. It is understood that this split may be altered later if say an ace director, agreeable to both of us, comes into the Company and we agree to give him some of the shares.

"2. I undertake to make all financial arrangements for the production and distribution of films made by our Company and generally to manage the Company.

"3. The story, script, director and cast of each film made by the Company are to be approved by you.

"4. Commencing not later than sixty days after your arrival in California next fall, the Company will pay you salary of $2,000.—(two thousand dollars) per week and commencing at the same time the Company will pay me salary of $1,000.—(one thousand dollars) per week. The Company will advance your travelling and other expenses until your salary commences.

"5. You agree to give the Company your exclusive services for at least five years and the Company will agree to make at least two pictures per year commencing from the date you are ready to start work in California. It is intended that all pictures in which you appear are to be produced by our Company but if at any time you find a good story in which you wish to appear and our Company is unable to either acquire the film rights in the story or make a deal with the person, firm or company owning such rights for the production of a picture based thereon, then in these circumstances it will be agreed that our Company will approve a loan out of your services to such other Company for the purposes of such picture.

"The above sets forth the agreement made between us to which I agree.
"Yours sincerely,
"/s/ D. E. Rose
"I agree the above
"/s/ James Mason"

[2] Judge Knox wrote a lengthy opinion and made findings of fact, the crucial findings being the following:
"10. The venture contemplated by the above mentioned writing and envisaged by the parties thereto was to be a substantial and ambitious project involving the production of first class feature motion pictures, the purchase of rights to stories, the hiring of actors and actresses and the incurring of necessary overhead expenses, the achievement of which would necessarily involve the procurement, investment and expenditure of large amounts of money and the disposition of profits if any should be realized.
"11. The above mentioned writing so far as the details of the relation between the parties is concerned, is vague and indefinite as to the method of obtaining capital, the payment of salaries to contract players; the purchase of stories, the payment of overhead and the disposition and reinvestment of profits, if any."

■ The parties are agreed that the New York conflict of laws rule should be applied to determine the law by which the legal effect of the June 5th letter should be tested. They are not, however, in agreement as to the law to which that rule points, the appellant asserting it is the law of California, where part at least of the performance was to take place, while the appellee maintains it is the law of England where the letter was drafted and signed. We think it clear that the law of New York makes the validity of a contract depend upon the lex loci contractus. Doubts, if any, which may have existed before the decision of Swift & Co. v. Bankers Trust Co., 280 N.Y. 135, 19 N.E.2d 992, were then dispelled. At page 145, of 280 N.Y. 19 N.E.2d page 997, the court stated that

"The validity of an instrument is always determined by the law of the place where the instrument was executed."

Another instance of the New York rule is In re Gantt, 297 N.Y. 433, 77 N.E.2d 323 where the validity of a contract to arbitrate was determined according to the law of North Carolina where the contract was made.[3]

The appellant contends that even if the law of England, as the place of making the contract, be deemed applicable, the result will be that California law controls, because the English law does not make the law of the place where the agreement is executed the test of its validity but looks to the law "to which the parties intended, or may fairly be presumed to have intend-ed, to submit themselves."[4] Professor Beale has stated that this rule "formulated by Professor Dicey expresses excellently well the purport of the English decisions."[5] In accord is African Breweries, Ltd. v. King (1899), 2 Ch. 173, 183 where the court stated the rule in a slightly different formula, selecting the law "of the country with which, to repeat Mr. Westlake's phrase, 'the transaction has the most real connection,' and that is undoubtedly the South African Republic * * *"[6] The appellant argues that an English court would find that the present transaction "has the most real connection" with California because, as the June 5th letter indicates, Mr. Mason was to "start work in California." However, the contemplated corporation which Mr. Rose was to form for the purpose of producing films was described merely as an "American Company" and could have been organized in any state. Since the formation of the producing company was the very essence of the joint enterprise, the inference that the parties intended California law to govern their agreement is not cogent.[7] But, as will appear from later discussion, we do not think it necessary to decide whether an English court would look to its own decisions or to California decisions to determine the validity of the letter contract.

If it be assumed that an English court would not look to the law of California, we think that the letter was too indefinite with respect to the parties' respective rights and obligations to be given effect as a binding contract under the English

---

[3] As Judge Learned Hand pointed out in his concurring opinion in Great Lakes Transit Corp. v. Marceau, 2 Cir., 154 F. 2d 623, 627, "the parties can make agreements, but they cannot make contracts; only the law of the place where they agree can do that." See also A. L. I. Restatement of Conflict of Laws, § 332.

[4] See Dicey, Conflict of Laws, 5th ed., p. 628. Of course, any state may make it part of its law that the validity of a contract shall depend upon the law of another state; and if England has made the law of another state than itself the measure of validity, that standard becomes the law of England pro hac vice.

[5] Beale, Conflict of Laws (1935), Vol. II, § 332.7.

[6] The contract was made in the South African Republic but the court did not stress that fact. The contemplated performance was to take place partly there and partly elsewhere in South Africa.

[7] Dicey, Conflict of Laws, 5th ed., p. 673, states that the English courts display a "distinct and still strong preference * * * for the lex loci contractus, especially when that place is England." They hold "in all cases of doubt, and especially where a contract is made in England, * * * that the proper law of the contract is the law of the country where the contract is made." Ibid., p. 886.

decisions.[8] If, on the other hand, it be assumed that an English court would look to the law of California, we find nothing in the California decisions which would lead to a different result. In that state, as in every other, a contract must be definite enough for a court to be able to ascertain what is the stipulated performance. Van Slyke v. Broadway Ins. Co., 115 Cal. 644, 47 P. 689, 690, 928; Wineburgh v. Gay, 27 Cal.App. 603, 150 P. 1003; Blake v. Mosher, 11 Cal.App.2d 532, 54 P.2d 492, 494.

The appellant asserts that an agreement creating a joint venture is in a special category and not subject to as strict a test of definiteness as contracts generally. The cases upon which he relies present situations where the parties had agreed in general terms upon a joint venture, and where usually the aggrieved party had put money into it.[9] Whether or not the aggrieved party had put in money, the other party had either got possession of the proposed subject matter, or had at least been able to exploit it for his own advantage. When the aggrieved party called him to account, he answered that there had never been any contract because all the terms had not been agreed upon, and, since there was no valid contract, he owed nothing to the aggrieved party except to return the money, if any, advanced. In such situations the courts decide that this answer is not sufficient and hold that the party who took over or exploited the subject matter did so as a joint adventurer. In some of the cases there are statements that a joint venture differs from other contracts in that co-adventurers do not have to agree on all the terms of their undertaking.[10] In our opinion the cases upon which the appellant relies are to be explained as instances of an imposed fiduciary duty rather than instances of making for the parties a contract which they never contemplated making and never made. In any event, all these decisions depend upon a benefit derived by the defendant out of the proposed subject matter of the common adventure.

■ In the case at bar the situation is quite different. There is no subject matter which one party has exploited for his own benefit. Each of the parties was to furnish his services to the venture—Mason as an actor, Rose as manager of the producing company. Neither had as yet contributed anything.[11] Hence the cases relied upon by the appellant are not controlling and we must decide according to ordinary contract rules whether the June 5th letter is too indefinite to be given legal effect as a contract. We think it is. Take Rose's engagements: He undertakes to make all financial arrangements for the production and distribution of films to be made by the company and generally to manage the company. Perhaps "management" could be made definite enough by reference to the practice of film producing companies, but "financial arrangements" are subject to a great variety of interpretations. Was he to furnish the necessary

---

[8] See Waring & Gillow v. Thompson, 29 Times L.R. (C.A.1912); Douglas v. Baynes, [1908] A. C. 477; G. Scammell and Nephew, Ltd. v. Ouston, [1941] A. C. 251; Bishop & Baxter, Ltd. v. Anglo-Eastern Trading & Industrial Co., Ltd., [1944] 1 K.B. 12. Cf. Triefus v. Winston, 85 Sol.J. 10 (K.B.1940) upon which the appellant relies.

[9] Replogle v. Ray, 48 Cal.App.2d 291, 119 P.2d 980; San Francisco Iron & M. Co. v. Am. Milling & Ind. Co., 115 Cal. App. 238, 1 P.2d 1008; Andrews v. Bush, 109 Cal.App. 511, 293 P. 152; Dolan v. Dolan, 107 Conn. 342, 140 A. 745; Anderson v. Blair, 202 Ala. 209, 80 So. 31; Triefus v. Winston, 85 Sol.J. 10 (K.B. 1940).

[10] In Dolan v. Dolan, 107 Conn. 342, 140 A. 745, 748, it is said that the contract is not avoided "because the minor details are not fully established." To the same effect is 33 C.J. 848; 48 C.J.S., Joint Adventures, § 4 page 819. The same texts elsewhere state that the ordinary contract rules apply to joint venture agreements. 33 C.J. 845, 847; 48 C.J.S. Joint Adventures §§ 2b, 3, pages 813, 817.

[11] In so stating we disregard the fact that Rose had caused articles of incorporation to be prepared and filed with the Secretary of State of California. Rose did this without submitting the articles to Mason and Mason immediately wrote that he was not prepared to bind himself to give services to the company so formed.

funds out of his own resources? That was a possible but not probable interpretation. If not, how were the large sums required by a motion picture producing enterprise to be raised? Was he free to borrow and pledge the company's credit on his own terms? Could he pledge Mason's agreement to give the company his exclusive services for at least five years? That might tie Mason up to others if the company failed, which was plainly contrary to Mason's intention. How the company was to be financed was left wholly at large. In this aspect the letter proposed nothing more definite than an agreement to form a corporation to produce motion pictures, the stock to be equally divided between the parties. This is just as vague as the agreement to form a syndicate "for the purpose of developing" the mineral resources of a farm, which was held unenforceable in Douglas v. Baynes, [1908], A. C. 477. Turning next to Mason's engagements: He was to give the company his exclusive services for five years but was to have the privilege under some circumstances of working for other film-producing companies. The company on its part was to be obligated to pay him a salary, to make at least two pictures a year and to "loan out" his services under stated circumstances. We think it clear that the letter contemplated the making of a contract between Mason and the company specifying the obligations of each to the other, and that the terms of such contract had to be determined before the venture could be said to be set up as intended.

█ In each of the foregoing respects—omission of terms for the financial structure of the company and omission of terms to be embodied in a formal contract between Mason and the company—the letter agreement was too incomplete to constitute a binding contract.

Judgment affirmed.

FRANK, Circuit Judge (concurring).

While I concur in my colleagues' decision, I do not agree with some of the statements made in reaching it.

1. I agree that the New York rules of conflicts of law control us, and that those rules refer us to the law of England; I also agree that, whether the law of England or that of California be ultimately governing, the letter of June 5, 1946 (quoted in footnote 1 of Judge Swan's opinion) is too indefinite to be an enforceable executory contract. I disagree only as to a statement unnecessary to the result in which my colleagues answer the question whether, when it is said that New York "law" refers us to the "law" of England, that means English "contract law" or English "conflicts law." On this point, it seems to me unnecessary to say anything. But my colleagues have assumed that, if the English courts would, in applying their "conflicts" rules, look to California "contract law" in passing upon the validity of the agreement, this court also should do so. Thus my colleagues seem to adhere to the doctrine of renvoi, needlessly taking a position in one of the most hotly debated disputes to fill the pages of the law reviews.

The question is a perplexing one which should be—and heretofore has been—approached cautiously by American courts. The New York courts, which here we must follow, have not yet taken a definitive stand on the question. Although there is an early dictum of the New York Court of Appeals to the contrary, Dupuy v. Wirtz, 53 N.Y. 556, two New York lower courts have more recently held that, when a New York "conflicts" rule refers to the "law" of another country, that does not include the "conflicts" rule of that other country. In Re Tallmadge, 109 Misc. 696, 181 N.Y.S. 336, the Surrogate's Court of New York County held that a will should be interpreted according to the French "law of wills," where a decedent of American nationality died domiciled in France. The French courts would have applied United States "law." In Lann v. United Steel Works Corp., 166 Misc. 465, 1 N.Y.S.2d 951, the Supreme Court, Kings County, applied Dutch contract "law," although the Dutch courts would have looked to German "law." This view, rejecting renvoi, is also the view of the Restatement of Conflict of Laws, § 7(b); see Illustration.

In the present case, where we all agree on the result, and substantially agree on the road by which we reach that result, I think we should be wary of unnecessarily stirring up the hornets' nest of renvoi along the way.

2. As I said before, I agree that under either the "law" of England or that of California, this agreement is too indefinite. In what my colleagues have said on this score, I concur. In the interest of caution, I would add that this case might have been different if Rose had made substantial expenditures or commitments in reliance upon the agreement. Cf. Judge Swan in Lord v. Pathe News, 2 Cir., 97 F.2d 508, where he cites with approval Anderson v. Blair, 202 Ala. 209, 80 So. 31, as to the unique aspects of joint adventure agreements.