[Civ. No. 11356. First Dist., Div. Two. Dec. 5, 1941.]

D. BEN REPLOGLE et al., Plaintiffs and Appellants, v. AGNES RAY, Defendant and Appellant.

Francis Gill, Hadsell, Sweet, Ingalls & Carroll and Hadsell, Sweet, Ingalls & Lamb for Plaintiffs and Appellants.

Pillsbury, Madison & Sutro, Eugene M. Prince, Fredrick H. Hawkins and Eugene D. Bennett for Defendant and Appellant.

SPENCE, J.—Plaintiffs sought declaratory relief and a money judgment against defendant. Defendant filed an answer and a cross-complaint seeking declaratory relief and a money judgment against plaintiffs. The complaint was in five counts. The cross-complaint was in four counts. The cause was tried by the court sitting without a jury and most of the issues were decided in favor of defendant. A judgment was entered on September 19, 1939, and thereafter, on September 22, 1939, a second judgment, denominated "Corrected Judgment," was entered. Plaintiffs have appealed generally from both judgments. Defendant has appealed from the portion of the corrected judgment of September 22, 1939, which denied defendant any relief on her fourth cause of cross-complaint.

The corrected judgment of September 22, 1939, was obviously intended to supersede the judgment of September 19, 1939, in its entirety. None of the parties challenges the power of the trial court to enter said corrected judgment

under the circumstances presented by the record before us. We therefore deem it appropriate to dismiss the appeal from the judgment of September 19, 1939, and to discuss only the appeals of the respective parties from the judgment of September 22, 1939.

These appeals are presented on a typewritten record containing over 1600 pages. In addition thereto over 150 exhibits have been brought up with said record. Plaintiffs' opening brief on their appeal alone consists of 336 pages and is largely devoted to the claim that the evidence was insufficient to sustain certain findings of the trial court. Plaintiffs have quoted freely from the record which covered the dealings of plaintiff D. Ben Replogle and F. M. Ray, now deceased, over a period of approximately thirty years. Defendant's opening brief on her appeal purports to present only a question of law, it being claimed that, upon the findings made by the trial court, a money judgment should have been awarded to defendant on her fourth cause of cross-complaint. Plaintiffs' reply to this claim is based in part upon the ground that this court should make other and different findings. Plaintiffs' reply brief on this last mentioned appeal alone consists of 171 pages. The pleadings, the testimony and the briefs before us are voluminous and it becomes apparent that this court can only briefly summarize the cause as presented on this appeal if the opinion herein is to be kept within reasonable bounds.

The interesting story presented by the evidence is one covering the trials and tribulations, the successes and failures and the disappointments and disagreements of two men who embarked upon a joint venture which continued over a long period of years. These two men were plaintiff D. Ben Replogle, who was an attorney at law and inventor, and F. M. Ray, the deceased husband and assignor of defendant, who associated himself with said plaintiff in the joint venture and furnished said plaintiff with financial assistance. It was conceded by all that there was an agreement of joint venture by which said parties were to share in the proportions of two-thirds to said Replogle and one-third to said Ray, but the other details of said agreement relating to the scope and duration of said joint venture were not conceded but were put in issue in this litigation. Admittedly at least two original patents covering improvements to vacuum cleaners were

involved in the joint venture. These two original patents are referred to as the suction handle patent and the cord reel patent. Plaintiffs claimed that these two original patents and no others were involved while defendant claimed that said two patents and all other patents, domestic and foreign, which related to vacuum cleaners and were obtained by said plaintiff in the subsequent years, were involved in the joint venture. The issues thus made were the main issues before the trial court and, as above indicated, the trial court decided these issues in favor of defendant. Before passing to a consideration of plaintiffs' contentions on their appeal we will attempt to summarize briefly the facts appearing in the record. Neither the name of plaintiff Belle Trumbull Replogle nor the name of defendant Agnes Ray will appear in this statement, except as it may become necessary to mention them, as said plaintiff was joined with her husband as the subsequent assignee of an undivided interest of her husband and defendant Agnes Ray was made defendant as the subsequent assignee of the entire interest of her husband, F. M. Ray, deceased. We will refer to plaintiff D. Ben Replogle, as "Replogle" and to F. M. Ray as "Ray."

Preliminarily, it may be stated that there was never any formal written agreement between the parties defining precisely their respective rights and duties in their joint venture. Mr. Ray died in 1936 and before the termination of the Air Way litigation to which reference will be hereinafter made. The present action was commenced in 1938, and of course, the trial court did not have the benefit of the testimony of Mr. Ray. Mr. Replogle testified at great length and a large amount of correspondence was introduced. The conduct of the two men over the years was also in evidence. As the details of the agreement of joint venture had not been reduced to writing, it was necessary for the trial court to determine the question of the scope and duration of the joint venture from the above mentioned testimony and the inferences which might properly be drawn therefrom. Even the testimony of Replogle on the details of the arrangements between these men was not very definite and certain. He used such expressions as "The arrangement as near as I can define it was . . . " and "The arrangement was something like this. . . . " But these considerations are not fatal to the finding of the existence of a joint venture with the necessary

incidental findings of the scope and duration thereof. As was said in *Andrews* v. *Bush,* 109 Cal. App. 511 [293 Pac. 152], at page 517, ''The law requires little formality in the creation of a joint adventure (*Anderson* v. *Blair,* 202 Ala. 209 [80 So. 31, 35]). Such an agreement is not invalid because of indefiniteness in respect to its details. (33 C. J. 848) . . . In considering whether or not a relationship such as that of joint adventurers or partners has been created the courts are guided not only by the spoken or written words of the contracting parties, but also by their acts.''

Replogle was a lawyer who had engaged in general practice but whose practice had turned almost exclusively into the field of patent work. He came to California and tried to continue in this field but soon gave it up. He started selling waterwheel governors and, in 1905, he met Ray, who was then selling water power machinery. The friendship thereafter developed. In 1908, Replogle was unemployed, and with Ray's promise to ''back'' him, Replogle built a vacuum cleaner driven by water power. Ray paid the costs of this experiment but the project was abandoned. Replogle then started selling electrically powered cleaners and continued to experiment. Ray contributed to the expenses of these experiments.

In 1911, Replogle applied for a patent, hereinbefore termed the suction handle patent. This patent was not issued until 1916 but both before and after the issuance thereof, Replogle executed a written assignment of a one-third interest to Ray. The second patent, hereinabove termed the cord reel patent, was applied for in 1914 and Replogle again executed a written assignment of a one-third interest to Ray.

The years from 1911 to 1918 were years of difficulty and discouragement for the two men. Numerous attempts were made by them to interest various manufacturers in these patents or to manufacture the cleaners themselves. Replogle acted as manager of the joint venture while Ray continued with his own business and furnished the necessary funds to Replogle. Some of the cleaners embodying these patents were manufactured either by other manufacturers or by themselves but loss rather than profit resulted from these ventures. During this period, Replogle continued his experiments and engaged in several patent proceedings. Throughout this period, Ray furnished certain necessary money to Replogle,

which Replogle testified was sent him "to use for any purpose I thought proper." He did in fact use the money advanced by Ray for labor, experimentation, filing fees, interference and contest expense and other things incidental to patent proceedings. It also appears that during part of this period, Ray contributed to the living expenses of Replogle's family and paid the taxes on their property. During all of that time, Replogle kept Ray advised concerning his progress with new experiments and with patent applications, using the terms "we" and "our" in his letters to Ray with respect to these matters. From the correspondence and the testimony of Replogle, it appears that Ray advanced to Replogle sums totaling in excess of $11,000 during that period, receiving at most but a few hundred dollars in return. The relationship between the men remained most friendly throughout that period and Replogle did not hesitate to express his appreciation for Ray's continued backing. As late as 1917, he wrote to Ray, "It is long drawn out but I see you are faithful to keeping my family off the rocks. God bless you!"

The year 1918 was the turning point. Early in that year, Replogle gave an option to Edison Electric Appliance Company to purchase for $50,000 all patents and applications for patents together with all materials and tools. Ray's name did not appear in the option but Replogle testified that he had wired Ray telling him of the proposal and asking Ray "whether it would be agreeable if I sold out, and he got the third of that." This option was not exercised and is mentioned only to show one of numerous instances in which it appears from the evidence that the parties acted upon the assumption that Ray had a one-third interest in all patents and patent applications relating to cleaners.

In December, 1918, the parties entered into what is termed the "Air Way" contract with an Ohio corporation. This was an agreement between the two men, as first parties, and The Air Way Company of Toledo, hereinafter called Air Way, as second party. It was signed by Replogle for himself and as attorney for Ray. This agreement was modified by two supplemental agreements, one made in 1922 and the other made in 1927, but the terms of the supplemental agreements are not material for the purpose of the present discussion. It was this Air Way contract of 1918 which resulted

in the receipt by the two men of large sums of money by way of royalties thereunder for many years and it is the determination of the respective rights of the parties to certain accruing royalties from Air Way under such agreement which is one of the subjects of this litigation. Following the execution of this Air Way contract, Replogle took certain actions with respect to foreign patents and foreign licenses on cleaners which precipitated prolonged litigation with Air Way commencing in 1931 and ending in 1937. It was the alleged damage resulting to Ray and to defendant, as the assignee of Ray, from these actions of Replogle that is the subject of defendant's fourth cause of cross-complaint in this action.

Briefly stated, the Air Way contract gave to Air Way an exclusive license to manufacture and sell cleaners under the suction handle and cord reel patents and under other patents and applications which were described by number and which included every patent which had been issued and every application which had been filed up to the time of the execution of said contract. But the agreement also provided that it extended to "all further patents which may be granted to first parties or either of them upon, relating or pertaining to any of the subjects included in the patents and applications for patent specified in paragraph 1 hereof." It provided that the term of the contract was the life of all patents involved and that the royalties were to be paid upon all machines using any of the patents. It further provided that "all royalty payments shall be made by check payable to the order of first parties." It did not however purport to specify the proportions in which said royalty payments were to be divided between Replogle and Ray. Nevertheless, the numerous royalty payments received under the contract over a period of approximately twenty years were divided two-thirds to Replogle and one-third to Ray. .

The contract further provided that all patents, whether issued before or after the date of the contract, should be transferred to a named bank as trustee and that in the event the company failed to comply with the terms of the contract, "said patents and applications for patents shall be reassigned, retransferred, and reconveyed by the trustee to the first parties." It also provided for the taking out of foreign patents by Replogle and Ray upon request of the company and the granting by them to the company of an exclusive

license to manufacture and sell under such foreign patents without additional expense except as to royalties accruing from such manufacture and sale. Provisions were also included for the forfeiture by the company of such foreign rights under certain conditions.

Shortly before Replogle executed the Air Way contract on behalf of himself and as attorney for Ray, he wrote Ray as follows, ''The contract is extensible so long as I take out cleaner patents, so it ought to serve us for the balance of our natural lives, even though we get pretty old. . . . '' Thereafter, the contract was executed and the patents and applications were transferred to the trustee as agreed.

The period from 1918 to 1931 was an era of prosperity for all concerned. While further money was advanced by Ray so that his total advances admittedly amounted to a sum in excess of $21,500, it appears that the royalties under the Air Way contract flowed in regularly during the years last mentioned. Ray's one-third interest resulted in his receiving a total sum in excess of $180,000 during that period. But even that period was not free from difficulties for the two men. There was a proceeding called the Kirby interference involving the patent on the vacuum cleaner dust bag. (See *Replogle* v. *Kirby*, 269 Fed. 862 [50 App. D. C. 210]; *Kirby* v. *Replogle*, 269 Fed. 864 [50 App. D. C. 212].) Replogle handled this proceeding but Ray paid the expenses. Ray also paid certain additional patent expenses during this period. In 1919, English patents were taken out at the request of Air Way and at Air Way's expense pursuant to the contract but Replogle claimed as early as 1922, that Air Way had forfeited its rights to an exclusive license under the foreign patents. Air Way denied that any forfeiture had taken place and thereafter claimed that the supplemental agreement of 1927 contained a waiver of any claim of forfeiture. Replogle also asserted a claim that Ray had no interest in any of the foreign patents. This claim was disputed by Ray and it remained a subject of controversy for some time.

In 1930, Replogle granted a license to Pneumode, Limited, an English corporation, to manufacture and sell cleaners under the foreign patents. In so doing, he acted solely in his own name and claimed that he had the right to do so without violating any of the rights of Air Way, on the one hand, or of Ray, on the other hand. He so advised Ray and

consistently adhered to that position. He further informed Ray as late as 1931 and shortly before Air Way commenced its suit in Ohio that Ray did not need independent legal advice. It was this action of Replogle in granting the license to Pneumode which precipitated the Air Way litigation. Replogle retained the entire sum of $1500 which he received at the time of granting said license.

Air Way filed its action in Ohio in 1931 against Replogle and Ray seeking to enjoin the granting of foreign licenses, to compel the cancellation of the Pneumode license and to recover damages. From that time until the termination of the litigation in 1937, Air Way paid the accruing royalties to a Toledo bank, which acted as trustee under the Air Way contract. Air Way also placed an attachment on the money so paid and neither of the men received any of said accruing royalties until the termination of the litigation in 1937. Ray died in the meantime in 1936 and defendant was thereafter substituted as his assignee.

The failure of the two men to receive the accruing royalties regularly during the depression years following the filing of the Air Way suit in 1931, led again to financial difficulties. Ray was in great financial distress. While prior to the filing of the action, he had asserted his claim against Replogle to an interest in the foreign patents, Replogle, as Ray's attorney and advisor, had advised him that he had no such interest. The correspondence and other evidence shows that it was frequently discussed over a period of time. Ray questioned Replogle's right, not only as to himself but also as to Air Way, to make the Pneumode contract. In this connection Replogle testified as follows: "Q. Didn't you tell him that you considered you had the legal right so far as any contract with Air Way was concerned to make the agreement with Pneumode? A. I got him to where he was satisfied that I had such legal right and was not criticizing me."

After the money had been attached in the Air Way litigation, Ray sought to have his share of the royalties released in order to relieve his financial condition. He was unsuccessful but in his attempt to obtain the release of the attachment and during the trial of the case, he took the position that he had nothing to do with the granting of the foreign license to Pneumode and that he had no interest in the foreign patents. We will discuss this position later but

we mention it here as plaintiffs lay great stress upon it to support their claim that Ray had no interest in the foreign patents.

The Air Way litigation was tried in Ohio and resulted in a judgment in favor of Air Way and against defendants Replogle and Ray. The judgment was affirmed on appeal in 1933 and by said judgment it was decreed that the granting of the Pneumode license was a breach of the Air Way contract. An injunction was granted against both Replogle and Ray and the cause was remanded for a jury trial on the issue of damage. There was delay in reaching trial on this issue and by 1937, the accumulated royalty payments, held in Toledo banks under court order, had reached a total sum in excess of $170,000. Ray had died in the meantime. Upon the assumption that the cause would be tried on the issue of damage in March, 1937, Replogle and defendant's attorney went to Toledo to confer with the Ohio attorneys, who had represented both Replogle and Ray, and to prepare for the trial. After it was learned that the case could not be tried for at least another year, a settlement was finally made with Air Way but it was understood that the settlement was not intended to settle the rights and obligations between Replogle and defendant. Pursuant to the settlement agreement one-half of accrued royalties were paid to Air Way. The sum of $45,000 was paid to the Ohio attorneys and the remaining balance of the accrued royalties was divided between Replogle and defendant in the proportion of two-thirds and one-third.

Shortly thereafter, Replogle notified Air Way that each further payment of royalties should be made by a single check in favor of himself and defendant and that the check should be delivered to Replogle. This was contrary to the practice which had been adopted by agreement between Replogle and Ray of having individual checks sent for their respective shares, but the request was in accordance with the terms of the Air Way contract. Air Way therefore complied with the request and thereafter delivered the royalty checks to Replogle.

Controversies arose between Replogle and defendant and between Replogle and defendant's attorney and no settlement was made between the parties after Replogle's return from Ohio following the settlement with Air Way. The uncashed royalty checks accumulated in Replogle's hands but

he was unable to cash them as they were made out jointly to himself and defendant. Defendant finally filed an action against Replogle seeking among other things to recover the loss sustained by reason of the Air Way litigation. Thereafter plaintiffs filed this action and all of the issues between the parties were brought before the trial court in this action by the pleadings to which reference has been made.

We may summarize the pleadings and plaintiffs' position on the main issues by saying that plaintiffs claimed in the trial court that neither Ray, nor defendant as his assignee, had any interest in any patents, domestic or foreign, other than the original suction handle and cord reel patents and that the rights of Ray and his assignee to royalties under the Air Way contract terminated at the expiration of the life of said two original patents in 1933. We may summarize defendant's position by saying that defendant claimed that Ray, and defendant as Ray's assignee, had a one-third interest in all of patents issued and applications filed on vacuum cleaners at any time and that their rights to royalties under the Air Way contract continued during the entire life of said contract and did not terminate in 1933. The findings and judgment of the trial court sustained the claims of defendant and awarded to defendant one-third of the accrued royalties.

### Plaintiffs' Appeal.

Plaintiffs' appeal from the judgment is based mainly upon their several contentions that the findings of the trial court which are contrary to the claims of plaintiffs as above set forth are not sustained by the evidence. We find no merit in this contention. On the contrary, we believe that there was ample evidence to sustain all of the material findings of the trial court on these main issues. Perhaps this conclusion might rest on the evidence already mentioned, but it appears appropriate that there be some further discussion of the situation presented to the trial court.

It being admitted by all that Replogle and Ray had engaged in a joint venture, it was necessary for the trial court to determine the scope and duration of that venture. That question had not been determined in the Air Way litigation as the only questions there determined were those concerning the rights and obligations as between Replogle and Ray, as the first parties, and Air Way, as the second party, under the Air Way contract. Nor had that question been deter-

mined at the time of the settlement with Air Way in Ohio as Replogle and defendant's attorney had agreed at that time that the settlement of all matters between Replogle and defendant should await their return to California. The trial court was called upon to determine the question of the scope and duration of the joint venture from all the facts and circumstances in evidence which tended to show the agreement, express or implied, between Replogle and Ray regarding such scope and duration.

Some of those facts and circumstances have been heretofore mentioned. Plaintiffs lay great stress upon the fact that the only written assignments to Ray of any interest in the patents were the written assignments of a one-third interest in the two original patents. This fact cannot be treated as controlling in the light of the great volume of evidence tending to show that the agreement of joint venture gave to Ray a one-third interest in all patents, domestic and foreign, and gave to Ray the right to one-third of the royalties under the Air Way contract for the life of that contract.

While the Air Way contract did not purport to define the rights as between Replogle and Ray, the very fact that said contract was executed by Replogle and that it contained the terms above set forth had some tendency to support the trial court's findings on the main issues now in controversy. It is significant also to note that Replogle did not take the position that Ray had no interest in the foreign patents until shortly before Replogle granted the license to Pneumode in 1930 and that he did not take the position that Ray's right to royalties under the Air Way contract terminated in 1933 until some time in 1938, being two years after Ray's death. During the earlier years, practically every act of both Replogle and Ray tended to show that they had expressly or impliedly agreed that Ray was to have a one-third interest in all of said patents and in all of said royalties as found by the trial court.

We quote but a few additional facts and circumstances among the many which appear in the record. As late as 1931, and while the controversy with Air Way was developing, Replogle wrote a letter in which he used the following ambiguous language in reference to the arrangement between them:

"In the first clause of our agreement 'Exhibit A', 'The first parties are owners of two United States Patents'. The first words of our contract are the basis of your connection with it, but outside of that contract, I have given you from time to time, my word of my moral obligation to you that this entire contract and all the patents mentioned in paragraph I thereof are to be shared by you as producing one-third the royalties for your benefit." In the Air Way litigation, Replogle testified, "A. Well, I understand it he has an equitable interest, always treated it so, in the patents licensed to the Air Way Corporation in the United States. Q. In all patents licensed to the Air Way in the United States? A. Yes." In 1932, Replogle wrote the trustee under the Air Way contract claiming that Air Way had breached the royalty contract and requesting the trustee to reassign all patents "to Daniel B. Replogle and Belle T. Replogle; two-thirds in their own right and one-third in trust for the equitable interest of F. M. Ray." And again in 1934, Replogle wrote to the Canadian Department of National Revenue as follows: "Mr. F. M. Ray has also a one-third interest in all of the contract, so that my part is divided into the other two-thirds, my wife holding one-third and myself one-third of the entire right and title to royalties in the Canadian contract." It thus appears that Replogle conceded in a letter to Ray the existence of at least a "moral obligation" on his part toward Ray with respect to all patents and conceded at other times that Ray owned at least an "equitable interest" in all patents.

It is entirely possible that the parties may never have expressly agreed upon the scope and duration of their joint venture, but it is a reasonable inference from all of the testimony, including their acts over the long period of years, that they had impliedly agreed as found by the trial court. In fact, it appears difficult to justify any other inference after reviewing the testimony.

In connection with the foreign patents, plaintiffs lay great stress upon the position taken by Ray during his efforts to obtain the release of the Air Way attachment and in his testimony on the trial of the Air Way case. As above stated, Ray had previously insisted that he had an interest in the foreign patents and had maintained that Replogle was acting in violation of Ray's rights and in violation of the Air Way contract in granting the license to Pneumode. He was ad-

vised by Replogle, his coadventurer and attorney, that such was not the case. It was but natural when the controversy with Air Way arose and Ray's royalties were threatened, that Ray should yield to that advice and seek to protect his interests in the royalties. At most, Ray's position at that time was but some evidence tending to show that he had no interest in the foreign patents, and, to that extent, it created a conflict with the other evidence before the trial court. But there was substantial evidence to sustain the trial court's findings with respect to Ray's interest in the foreign patents and the fact that there may have been a conflict, does not justify this court in disturbing said findings.

■ Plaintiffs further contend that the trial court erred in its findings with respect to the alleged interest of plaintiff Belle Turnbull Replogle. Plaintiffs alleged that plaintiff D. Ben Replogle has assigned to plaintiff Belle Turnbull Replogle a one-half interest in the royalty payments under the Air Way contract. This allegation was denied. The parties are not agreed with respect to the effect of the findings of the trial court on this issue. Obviously, however, the alleged assignment from plaintiff D. Ben Replogle could not give to plaintiff Belle Turnbull Replogle any greater rights than those of her assignor. As between both plaintiffs and the defendant, the findings above referred to are controlling. If plaintiff Belle Turnbull Replogle considered herself aggrieved by any alleged failure of the trial court to determine properly the respective rights of the individual plaintiffs, she should have prosecuted a separate appeal and should have made the other plaintiff a respondent on that appeal. She did not do so and she may not raise the question on this joint appeal. (*De Bairos* v. *Barlin,* 46 Cal. App. 665, 673 [190 Pac. 188].)

■ Plaintiffs further contend that the trial court erred in failing to allow to plaintiffs a recovery of $3333.33, which they claimed as alleged moneys expended for defendant's benefit in connection with the payment of attorney's fees in the Air Way litigation. We find no error in the trial court's ruling on this subject. The claims of the parties arising out of the Air Way litigation will be discussed when considering defendant's appeal. In passing, we may state, however, that plaintiffs' complaint included two common counts in each of which the plaintiffs sought to recover a money judgment against defendant amounting to $103,782.93. Defendant duly

demanded a bill of particulars but plaintiffs failed to file such bill. Plaintiffs concede that the above mentioned item of $3333.33 is the only item which they attempted to prove under those counts.

### Defendant's Appeal.

This appeal is directed at paragraph VI of the judgment providing that ''Defendant and cross-complainant take nothing by reason of her fourth cause of cross-complaint.'' It was the theory of defendant in said fourth cause of cross-complaint that the acts of plaintiff D. Ben Replogle which precipitated the Air Way litigation constituted a violation of the agreement of joint venture and that defendant was entitled to recover from plaintiff D. Ben Replogle the sums which were paid out of her share of the accrued royalties in settling that litigation. On this cause of cross-complaint the trial court made certain findings in favor of defendant but it made other findings upon which it based its denial of the recovery sought.

To summarize some of the material findings favorable to defendant on her fourth cause of cross-complaint, it may be stated that the trial court found that in December, 1930, Replogle, acting in violation of the agreement of joint venture and outside of the scope thereof and also acting in violation of the contract granting the above mentioned exclusive license to Air Way, granted to Pneumode a license to manufacture and sell vacuum cleaners in countries other than the United States; that in so doing, Replogle acted for his sole gain and advantage and independently of Ray; that the consideration received for the granting of said license to Pneumode was retained by Replogle; that the Air Way litigation resulted from said acts of Replogle and that after the determination of the Ohio court that both Replogle and Ray were liable in damages to Air Way by reason of the aforesaid breach of the Air Way contract and pending the trial to determine the amount thereof, the parties settled the Air Way litigation in order to avoid the possibility of a heavy damage award and to prevent the further impounding of royalties which were accruing under the Air Way contract; that the settlement with Air Way involved the payment by the parties to Air Way of the sum of $88,600 out of the impounded royalties and also involved the payment of $45,000 to Ohio attorneys who represented the parties in said litigation; that in

effecting said settlement, $29,533.33 was withdrawn from defendant's share of the impounded royalties to pay Air Way and $11,666 was withdrawn from defendant's share of the impounded royalties to pay said attorneys' fees; that neither Ray nor defendant participated in or was in any way responsible for the acts of Replogle which constituted the basis for Air Way's action; that defendant would not have been deprived of her share of the impounded royalties nor would she have suffered any loss or expense by reason of said litigation had it not been for said acts of Replogle; that it was agreed between the parties at the time of said settlement that their respective claims which were made the subject of this litigation should be reserved for future adjustment and settlement and that said claims should not be prejudiced by the settlement of the Air Way litigation.

Before proceeding to a consideration of the other findings and conclusions of the trial court with respect to defendant's fourth cause of cross-complaint, we will state that there was substantial evidence to sustain all of the material findings above summarized and we are of the opinion that said findings would have been sufficient to sustain a money judgment for defendant for her loss thus sustained. The loss sustained in the Air Way litigation was clearly a loss sustained as the result of the acts of one coadventurer outside of the scope of the joint venture and in violation of the agreement of joint venture and such loss must be borne by the party responsible therefor. (See 33 C. J. 866; *Caldwell* v. *Richards,* 91 Cal. App. 428 [267 Pac. 127]; *O'Hara* v. *Harman,* 14 App. Div. 167 [43 N. Y. Supp. 556]; see also with respect to partnerships Mechem's Elements of Partnership, 1899 Ed., sec. 115, p. 115; Rowley, Modern Law of Partnership, 1916 Ed., vol. 1, p. 435.) The action to recover such loss was based upon a breach of the agreement of joint venture, or in other words upon a breach of contract, and in such case, the party guilty of the breach may not defend upon the ground of alleged good faith, lack of negligence or advice of counsel. ■ Nor was the defense of "voluntary payment" available here. If the payment by defendant of a share of the loss sustained in the Air Way litigation may be said to have been voluntary as to the persons receiving the sums paid, it does not follow that such payment was voluntary as between defendant and Replogle so as to bar a re-

covery for defendant's loss. (See 48 C. J. 736; *Devine* v. *Meramec etc. Co.,* (Mo. App.) 253 S. W. 444.) ▮ Furthermore there was an agreement between the parties at the time of payment, that the rights between the parties would be reserved for future settlement. This constituted an express reservation of the right to recover any sums due and the doctrine of voluntary payment is inapplicable (48 C. J. 741).

Proceeding to the other findings and conclusions of the trial court on the fourth cause of cross-complaint, the following appears in the conclusions of law: "By reason and solely on account of the facts found as stated in paragraph XII of the court's findings with respect and in response to defendant and cross-complainant's fourth cause of cross-complaint, the court concludes that defendant and cross-complainant Agnes Ray is not entitled to recover anything against plaintiffs or either of them under or by reason of the said fourth cause of cross-complaint." In the above mentioned paragraph XII of the findings, the trial court found that Ray was advised by Replogle of his intention to secure foreign patents and to license foreign manufacturers other than Air Way and knew of Replogle's trips to Europe for that purpose but that the "record in this case does not show" that "said Ray asserted that he held or would hold Replogle liable for the loss suffered through the latter's incautious action in granting licenses to said foreign patents." In the same paragraph, the court found that Replogle did not anticipate that he was "inviting retaliation" by Air Way or subjecting Ray or defendant to loss and damage; that Ray had shared with Replogle without complaint the expense of previous litigation; that neither Replogle nor Ray had reason to believe that the loss "would be so excessive or to the extent which resulted" and that any statement by Ray to his wife that he believed that he had recourse against Replogle for any loss resulting from Replogle's acts was "the expression of a hope rather than a conviction" that Ray or defendant was entitled to reimbursement from Replogle. Immediately following finding XII and in finding XIII, the trial court made a finding with respect to the facts found in finding XII that "the acts or failure of action on the part of said F. M. Ray, as therein stated were due to and on account of advice and representation made by said D. Ben Replogle" as found in two pre-

ceding paragraphs of the findings relating to plaintiffs' alleged second cause of action. In said two preceding paragraphs, the court found that at all times mentioned, Replogle was an attorney at law; that he undertook to advise and did advise Ray; that said Ray relied upon such advice in all matters connected with the joint venture and, as to all of those matters, a fiduciary relationship existed between Replogle and Ray; that Ray reposed trust and confidence in Replogle and relied on Replogle to protect Ray's rights in the patents and all matters connected with the joint venture; that Replogle advised Ray that Ray had no interest in foreign patents or foreign licenses; that he further advised Ray that Replogle had the sole right to said foreign patents and to grant foreign licenses and that his action in granting foreign licenses was not in violation of the contract with Air Way. It was there further found that Replogle did not advise Ray or defendant to obtain, nor did they obtain, independent counsel until after the entry of the decree of the Ohio court and shortly before the Air Way settlement but on the contrary, Replogle advised that such independent counsel was not necessary.

It thus appears that the trial court concluded that defendant should be denied any recovery on the fourth cause of cross-complaint solely by reason of its finding that the record did not show that "said Ray asserted that he held or would hold Replogle liable for the loss suffered through the latter's incautious action in granting licenses to said foreign patents." That portion of finding XII is the only portion of said finding to which the court could have referred in the above mentioned conclusion of law. But the trial court also found in said finding XIII, that any failure of Ray to make such assertion was occasioned by the advice and representations of Replogle, Ray's trusted associate and legal adviser, to the effect that nothing which he was doing with respect to foreign licenses violated any of the rights of Ray or of Air Way.

We are of the opinion that the trial court's sole reason for denying to defendant a recovery on the fourth cause of cross-complaint was insufficient. Assuming that there may be instances in which the mere failure to assert that one will hold another liable for the violation of a claimed right will defeat a subsequent action for such violation, we are

satisfied that this is not such a case. Such failure here was found to be directly due to the advice given by Replogle to Ray, while Replogle was acting as Ray's attorney, and which advice was relied on by Ray. Under such circumstances, the mere failure of Ray to assert that he would hold Replogle liable for such violation cannot be held to have prejudiced Ray or his assignee in any subsequent action based upon such violation.

It appears that plaintiffs make no attempt to justify the ground upon which the trial court denied a recovery on said fourth cause of cross-complaint. They state that ''It is Mrs. Ray's contention that the judgment is based upon the idea that 'Ray can legally be bound by some sort of acquiescence arising from non-assertion of claim' for damages or reimbursement.'' They then state that ''Mrs. Ray mistakes our position'' and that ''we found this defense upon the proposition that Mr. Ray actually consented that Mr. Replogle proceed in England in the exercise of these foreign rights. . . . '' But the trial court found against plaintiffs on the question of actual consent and we are of the opinion that the evidence amply sustains said findings.

Plaintiffs then request that this court make other and different findings from those made by the trial court in order to sustain the portion of the trial court's judgment denying relief on the fourth cause of cross-complaint. We have already indicated that we believe that there is substantial evidence to support the material findings of the trial court. We are also of the view that this appeal does not present an appropriate case for the making of other and different findings under the rules laid down in *Tupman* v. *Haberkern*, 208 Cal. 256 [280 Pac. 970], at pages 265 to 267. This case presents to this court a situation where, upon the findings properly made and amply supported, an award should have been made by the trial court in favor of defendant on said fourth cause of cross-complaint. Upon said findings defendant was entitled to recover from plaintiff D. Ben Replogle the loss sustained by her which amounted to $29,533.33, paid to Air Way, together with $11,666.00, paid to the Ohio attorneys, out of her share of the impounded royalties. These two sums, added together, make a total of $41,199.33. Plaintiffs claim that, if it be conceded that defendant is entitled to judgment on the fourth cause of cross-complaint, the amount to be

awarded is but $16,807.74. This figure is calculated by plaintiffs upon the theory that Ray's rights to royalties terminated with the expiration of the life of the two original patents in 1933. We have heretofore discussed plaintiffs' contentions in this regard in considering plaintiffs' appeal and we found said contentions to be without merit.

■ Defendant claims that the amount to be awarded on defendant's fourth cause of cross-complaint should be $44,500 but this would require the addition of an amount which defendant claimed upon the trial but upon which the trial court made no finding. In defendant's reply brief on defendant's appeal, a belated suggestion is made that this court make additional findings with respect to this claimed additional loss. But we are of the opinion that a party seeking to have an appellate court make additional findings should make such request at the earliest opportunity in order that the opposing party may have the fullest opportunity to present arguments in opposition to the making of the requested additional findings. When such request is made by an appellant for the first time in his reply brief, we believe that such request should ordinarily be denied. ■ It is apparent from a reading of article VI, section 4¾ of the Constitution and of section 956a of the Code of Civil Procedure, that the power granted to appellate courts to make additional findings is a power which is to be exercised by an appellate court in the exercise of a sound discretion. In the exercise of such discretion, we believe it appropriate to deny defendant's request.

The appeal from the judgment of September 19, 1939, is dismissed. The judgment of September 22, 1939, is affirmed except as to that portion thereof which denied to defendant any relief on her fourth cause of cross-complaint. Said last mentioned portion of said judgment is reversed with directions to the trial court to enter an amended judgment awarding to defendant judgment against plaintiff D. Ben Replogle in the sum of $41,199.33 upon her fourth cause of cross-complaint. Defendant will recover her costs on these appeals.

Nourse, P. J., and Dooling, J. *pro tem.,* concurred.

A petition for a rehearing was denied January 3, 1942, and plaintiffs and appellants' petition for a hearing by the Supreme Court was denied February 2, 1942.