[Civ. No. 22538. First Dist., Div. One. Dec. 16, 1966.]

JAMES BOYD III et al., Plaintiffs, Cross-defendants and Respondents, v. EDWARD U. BEVILACQUA et al., Defendants, Cross-complainants and Appellants; BEVILACQUA DEVELOPMENT COMPANY et al., Defendants and Appellants; JAMES H. CULLOM, Defendant, Cross-defendant and Respondent.

Joseph L. Alioto, Gerhard Stoll, Bowman & Trant and Allen H. Trant for Defendants, Cross-complainants and Appellants and for Defendants and Appellants.

Webster V. Clark, Ricardo J. Hecht and Rogers, Clark & Jordan for Plaintiffs, Cross-defendants and Respondents.

No appearance for Defendant, Cross-defendant and Respondent.

SULLIVAN, P. J. — Defendants[1] and cross-complainants[2] appeal from an adverse judgment awarding plaintiffs compensatory and punitive damages against defendants and denying cross-complainants the Bevilacquas all recovery on their cross-complaint. As to the complaint, the judgment was entered on a jury verdict awarding plaintiffs compensatory damages in the sum of $65,750 and punitive damages in the sum of $34,250, subsequently ordered reduced to $50,000 compensatory and $20,000 punitive damages, pursuant to a remission filed by plaintiffs as a condition for the denial of defendants' motion for a new trial.[3] As to the cross-complaint, the judgment was entered after a trial before the court sitting without a jury. Defendants and cross-complainants also appeal from the court's order denying their motions for a new trial[4] and for a judgment notwithstanding the verdict.

The present controversy arises out of an oral joint venture agreement entered into by the parties for the purpose of purchasing and developing real property near Lemoore in Kings County. Initially, as it will appear, the members of the joint venture were plaintiff Boyd, R. E. Blake and defendants Bevilacquas, Marra and Cullom.[5] Later on plaintiff Doughty

---

[1]Defendants and appellants herein are: Edward U. Bevilacqua and Thomas H. Bevilacqua (hereafter sometimes referred to collectively as the Bevilacquas); the Glen Company (Glen); Bevilacqua Development Company, a corporation (Development Co.); Bevit Enterprises, Inc. (Bevit), and August Marra (Marra). The Bevilacquas were sued individually and as copartners doing business under the firm name and style of the Glen Company.

[2]Sole cross-complainants and appellants herein are Edward U. Bevilacqua and Thomas H. Bevilacqua, designated below individually and as copartners doing business under the firm name and style of the Glen Company.

[3]Defendants and cross-complainants moved to set aside and vacate the verdict, for a judgment notwithstanding the verdict, and for a new trial. The first two motions were denied. The motion for a new trial was granted unless within 10 days of said order plaintiffs consented to a reduction of the judgment in the amounts above stated, "in which event said motion for a new trial is denied and the judgment as reduced is ordered to stand." Plaintiffs timely filed such Consent to Reduce Judgment and the court thereafter ordered the "Judgment as reduced . . . to stand accordingly, . . ."

[4]Such an order is nonappealable and the appeal therefrom must be dismissed. (*Rodriguez* v. *Barnett* (1959) 52 Cal.2d 154, 156 [338 P.2d 907].)

[5]James H. Cullom, originally named as a defendant under Code of Civil Procedure section 382, filed an answer to the complaint jointly with the other defendants. Together with plaintiffs, he was also named a

replaced Blake. The land development was inspired by the construction of a U. S. Naval Air Base at Lemoore in the expectation that an influx of civilian and service personnel would create a demand for housing and commercial establishments. Such hopes were not to materialize.

The subject property owned by the Kate Beaver Trust first came to the attention of Blake in the early part of 1960. It consisted of approximately 60 acres of undeveloped land located outside but close to Lemoore city limits, on the main highway to Fresno and about six miles from the Naval Air Base. Blake was a land developer, had been in the general contracting business, and had been employed by a corporation specializing in building banks and developing motels. He proceeded to investigate the potential of the area for subdivision development, inquired as to the feasibility of having the property annexed by the City of Lemoore (City), and entered into discussions with one of the trustees and with the attorney for the trust.

On April 1, 1960 Blake obtained and became part owner of an option[6] to purchase the property for $150,000 payable as follows: $35,000 at the time of the exercise of the option and the balance of $115,000 to be represented by a promissory note of the buyers secured by a first deed of trust on the property. By its terms the option was to expire initially at 10 a.m. Pacific Standard Time on August 1, 1960; however, it was subsequently extended. At the time of the option there were no other subdivisions, apartment houses or other multiple dwellings, or commercial developments between the subject property and the Naval Air Base.

Controversy followed by litigation arose between Homchick and Paul on the one side and Blake on the other. In the early part of September 1960 Blake bought out his two associates for $15,000 pursuant to a so-called "buy-out" agreement entered into by all three parties and their respective wives on September 2, 1960. This money was obtained by Blake from James H.

cross-defendant in the cross-complaint filed by the Bevilacquas and filed a separate answer thereto. During the trial before the jury of the issues raised by the complaint and answer and prior to the submission of the case to the jury, Cullom withdrew from the trial and in open court waived any claim to damages. The court found and concluded that he was not entitled to damages and that there was nothing due from him to cross-complainants. Judgment was entered accordingly.

[6]The optionor was Genevieve Apperson, trustee under the Kate M. Beaver Trust (Seller) and the optionee was Richard A. Homchick and the nominee or assignee jointly designated (Buyer). Blake owned the option together with Homchick and Russell Paul.

Cullom (see fn. 5, *ante*) who had borrowed it from his father and as a result Cullom obtained a 10 percent interest in the option. Under a written agreement entered into by them on September 8, 1960,[7] the so-called "option group" consisted of Blake and his wife (80%), Longacre and Watson[8] (10%) and Cullom (10%).

However the parties were in need of financing in order to exercise the option. In their agreement of September 8 they listed these requirements as follows: $35,000 on or before October 14, 1960 under the terms of the option; $15,000 at that time to reimburse Cullom and $10,000 for operating expenses in connection with the development of the property. It was therefore at this point, in response to efforts by the option group to obtain financing, that the remaining parties to this action entered the picture. Cullom, plaintiff Boyd and defendant Marra were all employed by the same insurance company and, through Cullom, the last two persons became interested in the undertaking. It was through Boyd, reputed to have "some good contacts for finance money" that arrangements were made with defendants, the Bevilacquas. The parties agree that the first meeting with the Bevilacquas took place on September 23, 1960.

Defendants Edward and Thomas Bevilacqua, who were cousins, had been builders and tract developers for many years, engaged not only in constructing homes but in developing land, selling real estate, promoting commercial areas and building commercial structures and shopping centers. As previously mentioned (see fn. 2, *ante*), they were partners in the Glen Company. They also operated through the Bevilacqua Development Company (Development Co.), a corporation of which all of the stock was owned by said defendants and other members of their family. Edward and Thomas also owned a majority of the stock of Bevit Enterprises, Inc. (Bevit) a corporation used by them to handle real estate sales, general insurance and property management. The record reflects that their operations were extensive and diversified.

At the first meeting held by Blake, Cullom and Marra with the Bevilacquas on September 23, 1960, Blake outlined the project presenting a tentative subdivision map prepared by his

[7]Under the Paul-Homchick-Blake buy-out agreement, Blake had until September 11, 1960 to purchase all of interest of the first two persons for $15,000 payable in cash.

[8]Longacre and Watson received their 10 percent interest in consideration of legal services performed and to be performed for Blake.

engineers and cost estimates. The parties also discussed financing, money advances by the Bevilacquas, the necessity of returning the $15,000 to Cullom, the urgency of reaching some decision before October 14, 1960, the date to which the option had just been extended, and the basis of their participation. On the last point, according to Blake, discussion ensued "about a fifty-fifty situation all the way through for our option group, and fifty per cent for them, . . ." Under this arrangement, the Bevilacquas were to obtain the financing while Blake and his associates were to attempt to effectuate an annexation of the property by the City. The Bevilacquas indicated that they were interested in the project but that they first desired to inspect the property with Blake's engineers, to review the data pertinent to its development, and generally to determine whether the undertaking was practicable. Arrangements were made for all of the parties to go to Lemoore and inspect the property.

The trip was made during the following week. At this time they inspected the subject property, visited the naval base, and discussed the project with city officials and with various officers at the base. Shortly after their return the parties met with Navy officials at the Alameda Naval Air Station for the purpose of obtaining information as to increased personnel in Lemoore.

On October 10, 1960 the Bevilacquas and the option group entered into an oral joint venture agreement to develop between 14 and 18 acres of the subject property for commercial and multiple dwelling purposes. According to the agreement, the option group was to have a 50 percent interest in only the 14 to 18 acres with the remaining 50 percent in the Bevilacquas; and the balance of the property was to belong to the Bevilacquas to do with as they wished, all profits realized from such balance to be theirs exclusively.[9]

At this point we pause in the narrative to note two events which had occurred in the meantime and a third shortly after the joint venture agreement. The first was the change in the composition of the option group. By an agreement entered into on September 30, 1960 this group had become Blake (70%), Cullom (10%), Boyd (10%) and Marra (10%), the attorneys Longacre and Watson having been bought out for $1,500

<hr />

[9]The jury impliedly found and at the conclusion of the trial of the issues raised by the cross-complaint and the answer thereto, the court found that such was the substance of the joint venture agreement.

apparently upon the insistence of the Bevilacquas.[10] The second event was the extension of the option period. On October 5, 1960 the Bevilacquas, through their partnership Glen as buyer, had deposited $10,000 in escrow with a title insurance company at Hanford, under conditions giving said buyer 90 days to arrange for satisfactory financing and for annexation of the land by the City of Lemoore. Actually the effect of these provisions was to extend the option for 90 days from October 5, 1960. The third event involved defendant Marra who terminated his employment with the insurance company and eventually became an employee of the Bevilacquas about October 15, 1960.[11] However he remained a member of the option group until the altercation leading to the instant action arose.

During October and November Blake proceeded with his efforts to obtain an annexation of the property to the City of Lemoore. In this he was assisted by Marra who by this time was acting on behalf of the Bevilacquas and Glen, the buyer. Finally on December 20, 1960 an agreement was entered into between Glen, as the developer of the property, and the City under which the latter consented to the annexation and undertook to effectuate it promptly and the former agreed to install at its own expense certain specified subdivision improvements. It was at about this time that the Bevilacquas requested that Blake be eliminated from the option group. There was evidence not only as to a "strong permanent clash" between Blake and the Bevilacquas but as to Blake's financial difficulties which made his participation in a joint venture undesirable.

On December 1, 1960 plaintiff Sterling Doughty became a part of the option group in place of Blake. Doughty, a Sacramento businessman, became interested in the venture, talked with Boyd and Marra about it, and made his own independent investigation. In an initial meeting at Boyd's house, Boyd and Marra outlined the Lemoore project, stating that the commercial and multiple dwelling property was to be the subject of a joint venture with the Bevilacquas on a 50 percent basis, that according to the agreement the front acreage was to be developed first, that this development would include a motel, apartments, a restaurant and a bar, and that the Bevilacquas had agreed to exercise the option and complete the purchase.

---

[10]This was part of a loan of $1,700 made by the Bevilacquas to Blake and Marra. The disposition of the remaaining $200 is not clear.

[11]Marra was employed as vice-president and general sales manager of Bevit.

In the course of the preliminary negotiations Doughty was shown a letter dated November 17, 1960, written to a previous prospect Frank Alioto and presented to the latter at a meeting attended by Boyd. A copy of the letter was given to Marra. This letter purported to summarize the discussions had with Alioto by the option group who were then calling themselves "La Serena Development Co." It synopsized the "assets" and features of the project, stating among other things: "The 50% of La Serena Co. is now for sale for reasons discussed in our meeting. The new owner will be given 50% of the stock in a new corporation to be formed as a successor to La Serena Co. The other stockholders will be James Cullom, August Marra and Jim Boyd who will share equally. The new Corporation will have no liabilities at inception."[12]

Eventually the option group entered into two agreements: one with Blake buying the latter's interest;[13] another with Doughty which was in effect at the time the present controversy arose. Under this latter agreement dated December 1, 1960 Marra, Cullom and Boyd transferred to Doughty in consideration of $20,000 paid by the latter, 50 percent *of their interest* in the option. The three sellers were equal owners of the remaining interest. The interests therefore were: Doughty 50 percent, Marra, Cullom and Boyd 16⅔ percent each.

On December 20, 1960 the Glen Company and the City of Lemoore entered into an agreement with respect to the annexation of the 60 acres under option.[14] On January 10,

[12]Listed under the assets of "La Serena Development Co." appeared the following: "3. An agreement with the 'Glen Co.' of Bevit Enterprises (Bevilaqua [sic] to purchase the land on satisfactory completion of annexation, and to develop the property for its best purpose, providing the financing for same.

"4. Part of the agreement with the Bevilquas [sic] is that they will joint venture the front (commercial) 15 to 18 acres with 'La Serena Co.' on a 50/50 basis. This part of the project consisting of a motel, bar and restruant [sic] plus apartment units will be the first part of the property to be developed with the construction of the motel to be begun immediately on close of escrow.

"5. The present plans call for approximately $4,000,000.00 worth of improvements on the commercial property we are interested in."

[13]The agreement was entered into on November 28, 1960 between Blake as seller and Marra, Cullom and Boyd as buyers. The agreement provided: (1) that the $15,000 note held by Cullom (money loaned by his parents) would be retired on the close of escrow, and (2) that in addition a total price of $25,000 would be paid ($20,000 plus $5,000 on the date the proposed motel opened for business).

[14]This agreement in which Glen is referred to as a corporation and is designated as "developer" was signed on behalf of Glen by defendant Marra who by that time was in the employ of the Bevilacquas. Prior to

1961 the Bevilacquas paid into escrow an additional $25,000 in completion of the down payment on the property. On March 28, 1961 the escrow was closed and the property (60 acres) conveyed to "Glen Company, a co-partnership composed of Thomas H. Bevilacqua and Edward V. Bevilacqua." On March 30, 1961 the Bevilacquas filed with the city council their petition to annex the property.[15]

After entering the venture, Doughty became impatient with the progress being made and along with Boyd was most anxious to have the agreement with the Bevilacquas committed to writing. Marra and Boyd finally prevailed upon Thomas Bevilacqua and a letter dated March 24, 1961 was sent to Doughty outlining in rather general terms the progress and potential of the venture.[16]

Following receipt of this letter, Doughty was still not fully reassured and wished to meet with the Bevilacquas in person. A meeting was finally arranged and took place on April 20, 1961 at Boyd's home in Orinda, California. Those present in addition to Boyd were Cullom, Marra, the Bevilacquas, Roy Towers and Mr. Allen Trant, attorney for defendants. However, strangely enough Doughty was not present. The tenor of this encounter was acrimonious and plaintiffs' evidence showed in substance that the Bevilacquas repudiated the joint venture agreement stating that the option group had no interest in the project whatsoever. Defendants denied this.[17]

The present action was commenced on June 22, 1961 by

this Doughty and Boyd had gone to Lemoore to inspect the property and with Marra, as the Bevilacquas' representative, had conferred with the city attorney and appeared before the city council.

[15]The petition was filed by the Bevilacquas, copartners doing business as Glen*n* [*sic*] Company.

[16]This letter stated *inter alia*: "In reference to our development of the property in Lemoore, California, let me say at this time that all of our plans are not as yet firmed up to the point of actual and definite conclusions. However, I feel that I should outline in a general way for your records what our present thinking is and what has taken place up to now in terms of progress and planning.

"a) Our participation as a group will be limited to the commercial and multiple acreage. (approximately 14 acres) As to the actual form of our association, we have not completely decided, and would like to have your thoughts along these lines. This group will include the Glen Company, yourself, Jim Boyd, Jim Cullom and Augie Marra. . . .

"c) The property has been purchased and transferred to the Glen Company and by agreement with the seller specific acreage has been released to us for development."

[17]This evidence was to the effect that the option group "didn't have anything" and so far as the Bevilacquas were concerned "never did have anything."

Boyd and Doughty. Their complaint[18] sets forth in extensive detail the history of the joint venture substantially as we have summarized the events above, alleging thereafter in substance as follows: that the Bevilacquas, shortly after entering into the joint venture conspired to defraud the option group and to convert and appropriate all of the land subject to the option to their own use; that on or about October 15, 1960 defendant Marra joined this conspiracy and was employed by the Bevilacquas;[19] that the Bevilacquas failed to perform all their obligations under the joint venture agreement except that they furnished the sums necessary to exercise the option and to buy out Watson and Longacre; that said defendants aided and abetted by defendant Marra excluded plaintiffs and defendant Cullom from the management of and participation in the venture; that they converted to their own use and benefit all the assets thereof, including the acreage; that they destroyed the business of the venture and terminated it; that defendants Bevilacqua possess and have title to all of the land formerly the subject of the option; and that plaintiffs and defendant Cullom have been damaged in the sum of $465,000.[20] The complaint also sought $200,000 exemplary damages for alleged oppression, fraud and malice on the part of defendants.

Defendants Bevilacqua's answer in the main put in issue the material allegations of the complaint, denying the oral agreement for the joint development of the land as asserted by plaintiffs and alleging that said defendants agreed to purchase the property and *thereafter to negotiate* the purchase by the

---

[18]Entitled ''Complaint for Damages Arising Out of Breach of Joint Venture Agreement and Fiduciary Duty.''

[19]The complaint alleges in detail that in furtherance of the conspiracy, defendants Bevilacqua took steps to have Blake extend the option and thereafter have him eliminate Watson and Longacre from the option group; that, after the entrance of Marra into the conspiracy, they took steps to have Blake eliminated as a detriment to the venture; and that after Doughty became a member of the option group, defendants Bevilacqua on January 10, 1961 paid into the escrow the sum of $25,000, being the balance required to exercise the option, but persuaded the option group to agree to a postponement of the performance of the obligation on said defendants' part to advance the further sums of $10,000 for the development of the project and $15,000 to pay Cullom *until title to the property vested of record in Glen,* upon the representation that they would perform these obligations at that time.

[20]The complaint at this point alleges that the fair market value of all the land, with off-site improvements, is, and since March 28, 1961 has been $914,000; that the cost of the land and the off-site improvements is and has been not more than $421,000; and that the cost of the off-site improvements is $27,500 (actually resulting in a balance of $465,500 as claimed damages).

proposed joint venture from Glen of a portion of the acreage for development as a multiple dwelling and commercial area.

Thus the crucial issues raised by the complaint and answer and tried to the jury were two: (1) Whether defendants Bevilacqua entered into an oral joint venture agreement with the so-called option group for the purchase and development of the land near Lemoore; and (2) whether said defendants repudiated the agreement or fraudulently appropriated the land to the exclusion of plaintiffs and in violation of any fiduciary relationship. It was plaintiffs' position in the court below that there was such an oral joint venture agreement for the purchase, development and sale of the land; it was defendants' position that there was an oral joint venture agreement but *only* to *purchase* the land and that the remainder of plaintiffs' assertions about the agreement were so indefinite and uncertain as not to constitute a binding contract. According to plaintiffs, there was a single agreement of broad scope providing for the acquisition of the land, the development of the commercial acreage by the joint venture on a fifty-fifty basis and the retention of the balance of the 60 acres by the Bevilacquas for their own exclusive account. According to defendants, not merely *one* but *two* joint venture agreements were involved: the first, under which they were to purchase all the property and hold title to the commercial acreage portion under a contemplated *second* joint venture agreement for the development and operation of such acreage. This second agreement, according to defendants, was so indefinite and uncertain as to never acquire the legal status of a binding agreement. These issues were tried to the jury under proper instructions and resolved favorably to plaintiffs.

Defendants now contend on appeal, as they did below, that the joint venture agreement found to have been entered into was an agreement to agree in the future and therefore unenforceable. The gist of their argument, to which we note defendants allot barely one page of their opening brief, is that since the plans for the development of the commercial area had not yet been made, such part of the agreement was unenforceable as an agreement to agree in the future and, being unseverable from the rest of the agreement, fatally infected the joint venture agreement as a whole. It thus appears that defendants, having lost the issue as to whether one or two agreements were contemplated, seek to avoid the unfavorable finding by now making substantially the same argument under the guise of asserting *two* parts to the *same* agreement.

■ A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. (*Nelson* v. *Abraham* (1947) 29 Cal.2d 745, 749 [177 P.2d 931]; *Goldberg* v. *Paramount Oil Co.* (1956) 143 Cal. App.2d 215, 219 [300 P.2d 329]; *Lasry* v. *Lederman* (1957) 147 Cal.App.2d 480, 485 [305 P.2d 663]; *James* v. *Herbert* (1957) 149 Cal.App.2d 741, 748 [309 P.2d 91].) ■ The existence of a joint venture depends upon the intention of the parties. (*Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 764-765 [128 P.2d 665]; *Lasry* v. *Lederman, supra,* p. 486; *James* v. *Herbert, supra.*) ■ As was said in the *Universal* case, *supra*: "Whether the parties to a particular contract have thereby created, as between themselves, the strict relation of joint adventurers or some other relation involving cooperative effort, depends upon their actual intention, which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts. [Citation.] Such a contract need not be express; it may be implied from the conduct of the parties. [Citation.] The acts and conduct of the parties engaged in the accomplishment of the apparent purposes may speak above the expressed declarations of the parties to the contrary. [Citation.]" (20 Cal.2d at pp. 764-765.) ■ "The law requires little formality in the creation of a joint venture and the agreement is not invalid because it may be indefinite with respect to its details. [Citations.]" (*Lasry* v. *Lederman, supra,* 147 Cal.App.2d at p. 487; *James* v. *Herbert, supra*; *Sadugor* v. *Holstein* (1962) 199 Cal.App.2d 477, 483 [18 Cal.Rptr. 859]; *Drdlik* v. *Ulrich* (1962) 203 Cal.App.2d 360, 365 [21 Cal.Rptr. 642]; *Simpson* v. *Winkelman* (1964) 225 Cal.App.2d 746, 750 [37 Cal.Rptr. 721].)

As we have said, defendants argue that the joint venture agreement was void, "came to nought" as they put it, because part of it was an agreement to agree in the future. ■ "The general rule is that if an 'essential element' of a promise is reserved for the future agreement of both parties, the promise gives rise to no legal obligation until such future agreement is made. [Citation.] ■ The enforceability of a contract containing a promise to agree depends upon the relative importance and the severability of the matter left to the future; it is a question of degree and may be settled by determining whether the indefinite promise is so essential to the bargain that inability to enforce that promise strictly according to its terms would make unfair the enforcement of the

remainder of the agreement. [Citations.] ■■ Where the matters left for future agreement are unessential, each party will be forced to accept a reasonable determination of the unsettled point or if possible the unsettled point may be left unperformed and the remainder of the contract be enforced. [Citations.]'' (*City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 433 [333 P.2d 745]; in accord: *Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 194 [28 Cal.Rptr. 724, 379 P.2d 28]; *Ablett* v. *Clauson* (1954) 43 Cal.2d 280, 284-285 [272 P.2d 753]; *Borden* v. *Piscovich* (1963) 212 Cal.App.2d 225, 227 [27 Cal.Rptr. 868]; *Louis Lesser Enterprises, Ltd.* v. *Roeder* (1962) 209 Cal.App.2d 401, 408 [25 Cal.Rptr. 917]; *Pacific Hills Corp.* v. *Duggan* (1962) 199 Cal.App.2d 806, 809 [19 Cal.Rptr. 291].) We must compound all of these principles into the amalgam of a rule for the instant case.

Defendants' treatment of the point offers nothing beyond the bare statement that the plans for the commercial development had not yet been made. Our attention not having been called to any particular omission fatal to this part of the agreement, we wonder whether defendants' claim is that there were no plans at all. Plaintiffs on the contrary contend that a fair appraisal of the evidence warrants the conclusion that no essential part of the plans had been reserved for future agreement. This claim they buttress with a detailed argument supported by extensive record references. The gist of it is as follows: that while the precise business instrumentality, corporate or otherwise, for holding and developing the property remained to be selected, there was a clear agreement on the part of both groups to engage in such cooperative effort on the basis mentioned; that the amount of commercial acreage was indicated within a range of 14 to 18 acres dependent upon what the City would allow in the way of zoning and was thus capable of being rendered certain by the City's final decision; that the option group had a firm agreement with the Bevilacquas that the latter would build between 250 and 300 apartment units ''as was discussed on several occasions,'' the parties ''trying for 300 units'' and the actual number again depending upon the City's zoning decision; that while the precise time for the start of construction had not been fixed, the parties agreed that in view of the anticipated demand for housing, the motel would be built first and as soon as possible and the apartment units as soon as possible thereafter ''which was immediately and perhaps concurrently'' and thus that

construction would start as soon as reasonably possible; that since the parties agreed that a "first class" motel and apartments were to be constructed, there was a reasonably definite criterion to which defendants experienced in this type of construction could conform their work and by which a court could determine whether there had been a reasonable performance; that the purchase price of the land noted above was certain and that the cost of the improvements, agreed to be in the amount of $4,000,000, 100 percent financed, the financing to be procured by defendants, was likewise certain; and that the parties had agreed as to how the liabilities of the venture were to be secured. Defendants in their closing brief offer no counter to this meticulously documented argument other than the generalized rejoinder that the record is devoid of evidence showing an agreement in fact on the basic parts of the agreement.

We are persuaded that plaintiffs' argument has merit and that the jury, under the instructions,[21] and on the basis of the evidence was warranted in finding that a sufficiently definite agreement of joint venture was entered into. The principles as to certainty of the promise must be coordinated with the principles as to joint ventures, which require little formality in their creation and permit indefiniteness with respect to details. (*Lasry* v. *Lederman, supra,* 147 Cal.App.2d 480, 487 and other cases *supra.*) ■ "The law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." (*McIllmoil* v. *Frawley Motor Co.* (1923) 190 Cal. 546, 549 [213 P. 971]; *Bohman* v. *Berg* (1960) 54 Cal.2d 787, 797 [8 Cal.Rptr. 441, 356 P.2d 185]; *Wong* v. *Di Grazia* (1963) 60 Cal.2d 525, 539 [35 Cal.Rptr. 241, 386 P.2d 817].) ■ Contracts must be definite enough so that a court can ascertain what is required of the respective parties and whether their respective obligations have been performed or breached. (*Richards* v. *Oliver* (1958) 162 Cal.App.2d 548, 561 [328 P.2d 544]; Rest., Contracts, § 32.) ■ Less certainty in the terms of an agreement is required in an action at law for damages than in an action in equity for specific

---

[21]The jury was instructed that if the conversations and negotiations between the parties constituted merely an agreement to agree in the future or left any essential element of the arrangements, plans or relationship to be determined in the future, they should conclude that no agreement was reached.

performance. (*Pascoe* v. *Morrison* (1933) 219 Cal. 54, 58 [25 P.2d 9] ; *Bettancourt* v. *Gilroy Theatre Co., Inc.* (1953) 120 Cal.App.2d 364, 372 [261 P.2d 351].) The reason for this is that ''An action at law is founded upon a mere nonperformance by a defendant, and this negative conclusion can often be established without determining all the terms of the agreement with exactness.'' (*Pascoe* v. *Morrison, supra.*)

We think that the same reasoning prevails where, as here, the contract is entirely repudiated by one of the parties and the fruits of the venture are sought to be appropriated. ▇ The parties assumed the status of fiduciaries and neither group had the right to acquire the property to the exclusion of the other. (*Lasry* v. *Lederman, supra,* 147 Cal.App.2d 480, 487.) A breach of such fiduciary duty could be established ''without determining all the terms of the agreement with exactness.'' (*Pascoe* v. *Morrison, supra,* 219 Cal. 54, 58.) The present action sounds in tort, not in contract. Defendants' subsidiary argument that plaintiffs were not entitled to damages but only to an accounting with a return of whatever they had contributed is misconceived. Defendants by their own acts terminated the joint venture. ▇ The rights and liabilities of joint adventurers, as between themselves, are governed by the same rules which apply to partnerships. (*Zeibak* v. *Nasser* (1938) 12 Cal.2d 1, 12 [82 P.2d 375] ; *MacIsaac* v. *Pozzo* (1945) 26 Cal.2d 809, 813 [161 P.2d 449].) ▇ While therefore it is the general rule that, as in the case of partners, a joint adventurer may not sue his co-adventurer in an action at law in respect to the joint venture until an accounting has been had, such rule does not apply where the wrongful act or acts complained of are not only a breach of contract but constituted a tort and particularly where the tort is of such a nature that it terminates the joint venture, wrongfully destroys it and results in the conversion by the co-adventurer of the entire assets to his own use. (*Johnstone* v. *Morris* (1930) 210 Cal. 580, 585-586 [292 P. 970] ; *Wilson* v. *Brown* (1929) 96 Cal.App. 140, 143 [273 P. 847] ; *Berning* v. *Colodny & Colodny* (1930) 103 Cal.App. 188, 192 [284 P. 496] ; *Laughlin* v. *Haberfelde* (1946) 72 Cal.App.2d 780, 787-790 [165 P.2d 544] ; *Driskill* v. *Thompson* (1956) 141 Cal.App.2d 479, 482 [296 P.2d 834] ; *Barlow* v. *Collins* (1958) 166 Cal.App.2d 274, 278 [333 P.2d 64] ; see *Moropoulos* v. *C. H. & O. B. Fuller Co.* (1921) 186 Cal. 679, 687 [200 P. 601].)

We therefore conclude that under the circumstances of the instant case the usual tests of certainty in contracts evolve no

imperative against the recovery of damages. Pertinent here are the views of the court in *Mason* v. *Rose* (2d Cir. 1949) 176 F.2d 486, 489 to which we alluded in *Pacific Hills Corp.* v. *Duggan, supra,* 199 Cal.App.2d 806, 812-813. *Mason,* noting certain cases, including three California cases,[22] urged in support of the proposition that a joint venture agreement was not subject to as strict a test of definiteness as contracts generally, observed that such cases "present situations where the parties had agreed in general terms upon a joint venture, and where usually the aggrieved party had put money into it. Whether or not the aggrieved party had put in money, *the other party had either got possession of the proposed subject matter, or had at least been able to exploit it for his own advantage. When the aggrieved party called him to account, he answered that there had never been any contract because all the terms had not been agreed upon, and, since there was no valid contract, he owed nothing to the aggrieved party except to return the money, if any, advanced.* In such situations the courts decide that *this answer is not sufficient and hold that the party who took over or exploited the subject matter did so as a joint adventurer.* In some of the cases there are statements that a joint venture differs from other contracts in that co-adventurers do not have to agree on all the terms of their undertaking. In our opinion the cases upon which the appellant relies are to be explained as instances of an imposed fiduciary duty rather than instances of making for the parties a contract which they never contemplated making and never made. *In any event, all these decisions depend upon a benefit derived by the defendant out of the proposed subject matter of the common adventure.*" (Italics added; fns. omitted.) (176 F.2d at p. 489.)

Defendants cite without analysis *Pacific Hills Corp.* v. *Duggan, supra,* 199 Cal.App.2d 806 and *Louis Lesser Enterprises, Ltd.* v. *Roeder, supra,* 209 Cal.App.2d 401. Both cases are distinguishable. *Pacific Hills* involved a naked agreement to enter into a contract in the future, differentiated from those cases which "deal with contracts creating a joint ventureship, not, as here [i.e., *Pacific*], a contract to create one." (199 Cal.App.2d at p. 812.) *Louis Lesser* involved three letters amounting to no more than an interim agreement not intended

---

[22]*Replogle* v. *Ray* (1941) 48 Cal.App.2d 291 [119 P.2d 980]; *San Francisco Iron & Metal Co.* v. *American Milling & Industrial Co.* (1931) 115 Cal.App. 238 [1 P.2d 1008]; *Andrews* v. *Bush* (1930) 109 Cal.App. 511 [293 P. 152].

to be binding until a lawyer selected by the parties reduced the provisions to a binding written contract.

We turn to defendants' second contention that as a matter of law "there was no fraud" and that plaintiffs were therefore not entitled to damages, either compensatory or punitive. Defendants present the argument in querulous vein, insisting that the bursting of the Lemoore bubble impelled plaintiffs to pursue tort remedies. This is beside the point since, as we have explained, they were entitled to do so. (See *Johnstone* v. *Morris, supra,* 210 Cal. 580, 585-586 and other cases cited *supra.*) More in point is whether the jury's implied finding of fraud is supported by the evidence. Eschewing any analysis of the problem under the familiar rules of appellate review (see *Marshall* v. *Marshall* (1965) 232 Cal.App.2d 232, 236, 246 [42 Cal.Rptr. 686] and cases there collected), defendants appear to present an argument more suitably directed to a trier of fact.

The trial judge instructed the jury not only on constructive fraud but also on actual fraud. No claim is made that such instructions were not correct statements of law. "Constructive fraud consists: 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or, 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud." (Civ. Code, § 1573.) ▉ Constructive fraud frequently consists in the breach of a duty arising out of a confidential or fiduciary relationship. (*Estate of Arbuckle* (1950) 98 Cal. App.2d 562, 568-569 [220 P.2d 950, 23 A.L.R.2d 372]; *Devers* v. *Greenwood* (1956) 139 Cal.App.2d 345, 349 [293 P.2d 834].) As we have said, where as here, there is an agreement of joint venture the parties assumed the status of fiduciaries and neither one had the right, while the joint venture existed, to acquire the property to the exclusion of the others. (*Lasry* v. *Lederman, supra,* 147 Cal.App.2d 480, 487; *James* v. *Herbert, supra,* 149 Cal.App.2d 741, 747-748; see also *Nelson* v. *Abraham, supra,* 29 Cal.2d 745, 750-751; *Larson* v. *Thoresen* (1951) 36 Cal.2d 666, 669 [226 P.2d 571].) ▉ Indeed, during the existence of such fiduciary relationship any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining the advantage to show fairness and good faith in all respects. (*Solon* v. *Lichten-*

*stein* (1952) 39 Cal.2d 75, 82 [244 P.2d 907]; *Johnson* v. *Clark* (1936) 7 Cal.2d 529, 534-535 [61 P.2d 767]; *Roeder* v. *Roeder* (1953) 118 Cal.App.2d 572, 580 [258 P.2d 581].) ▇▇ The presumption is evidence and is sufficient to sustain a finding of fraud although there may be direct evidence contrary to it. (*Bradner* v. *Vasquez* (1954) 43 Cal.2d 147, 153 [272 P.2d 11]; *Solon* v. *Lichtenstein, supra*; *Chung* v. *Johnston* (1954) 128 Cal.App.2d 157, 164 [274 P.2d 922].)

Under the evidence summarized by us, the jury were warranted in concluding that defendants Bevilacqua, as coadventurers of plaintiffs, breached their duties arising out of the joint venture relationship and secured an advantage by acquiring the property of the joint venture to the exclusion of plaintiffs who were told that they had no interest in the project whatsoever. The issue was one of fact. The implied finding of the jury on it was adverse to defendants and is amply supported by the evidence.

We come now to the question of actual fraud. As already stated, the theory of plaintiffs as reflected by their pleadings, the pretrial conference order and their proof at trial, was that defendants Bevilacqua, aided and abetted by Marra, conspired to defraud the option group by appropriating all of the land to their own use. The embroidery of circumstances and concatenation of events leading to this objective have already been detailed and need not be repeated here. In pursuit of this theory, plaintiffs claimed that defendants committed actual fraud by making three material promises without any intention of performing them: (a) by promising to lend the option group $15,000 to repay the loan made by Cullom in order to buy out Blake's first associates; (b) to lend the option group $10,000 to defray expenses; and (c) to convey the commercial acreage to the joint venture (in which the option group would have a 50 percent interest) when title to all of the 60 acres vested in Glen, defendants' partnership. The evidence bearing upon the entire issue is in conflict. ▇▇ But, there is evidence that the first two promises were made; that they were a material factor in the decision of the group holding the option to enter the joint venture; that although the option group made frequent requests for the money and were given repeated assurances that it would be paid, they in fact never received it; that in the meantime defendants Bevilacqua obtained from the group a written assignment of the option held by them and thus armed were able to close the escrow and become vested with title to all the acreage. The evidence is clear that defend-

ants never conveyed the commercial acreage to the joint venture.

This theory of case and the Bevilacquas' theory of defense in opposition thereto were presented to the jury under proper instructions. The trial judge instructed the jury, *inter alia,* on actual fraud, giving an instruction in practically the same language as Civil Code section 1572 subdivisions 1, 3, 4 and 5.[23] ▮ Actual fraud is a question of fact (Civ. Code, § 1574) and like any other fact may be proved by circumstantial evidence. (*Palmquist* v. *Mercer* (1954) 43 Cal.2d 92, 100 [272 P.2d 26].) ▮ Thus, as this court has said on previous occasions, an intention not to perform a promise may be a matter of inference from the facts proven. (*Holiday* v. *Tolosano* (1918) 39 Cal.App. 151, 153 [178 P. 170]; *Wilson* v. *Rigali & Veselich* (1934) 138 Cal.App. 760, 765 [33 P.2d 455]; *Jarkieh* v. *Badagliacco* (1946) 75 Cal.App.2d 505, 509 [170 P.2d 994].) We said in *Wilson*: "The intention not to perform a promise is a matter of inference from the facts proven and subsequent conduct may be sufficient to show such intention. [Citations.] . . . Without the consideration of other evidence, the subsequent failure to perform warrants the inference that appellants did not intend to perform when they promised." (See also *Longway* v. *Newbery* (1939) 13 Cal.2d 603, 611 [91 P.2d 110]; *Estate of Barrow* (1938) 27 Cal.App.2d 402, 405 [80 P.2d 1006]; *Klutts* v. *Rupley* (1943) 58 Cal.App.2d 560, 563 [137 P.2d 496]; *Grant* v. *United States Electronics Corp.* (1954) 125 Cal.App.2d 193, 199 [270 P.2d 64].) ▮ We are of the opinion that on the basis of the evidence in the record summarized by us above, the jury could properly infer that at the time of entering into the joint venture defendants had in fact no intention of performing the promises above-mentioned but on the contrary had for their purpose and objective eventual control of all the property for their own account. ▮ Defendants insist that the law requires a clear and convincing showing of actual fraud. However this is nothing more than a rule of evidence directed to the trial court whose determination of the issue is conclu-

---

[23]Civil Code section 1572 in pertinent part provides: "Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; . . . 3. The suppression of that which is true, by one having knowledge or belief of the fact; 4. A promise made without any intention of performing it; or, 5. Any other act fitted to deceive."

sive on appeal if supported by substantial evidence. (*Chung* v. *Johnston, supra,* 128 Cal.App.2d 157, 164; *Maslow* v. *Maslow* (1953) 117 Cal.App.2d 237, 243 [255 P.2d 65]; *Baines* v. *Zuieback* (1948) 84 Cal.App.2d 483, 488 [191 P.2d 67]; 3 Witkin, Cal. Procedure (1954) pp. 2246-2247; Witkin, Cal. Evidence (1958) pp. 78-79; and see in another context *Marshall* v. *Marshall, supra,* 232 Cal.App.2d 232, 246 and cases there collected.) Contrary to defendants' claim, the award of exemplary damages was proper. (Civ. Code, § 3294; *Haigler* v. *Donnelly* (1941) 18 Cal.2d 674, 680 [117 P.2d 331]; *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 743 [336 P.2d 534].)

 Defendants next contend that the trial court erred in instructing the jury on the subject of conspiracy. They claim that just before the case was submitted to the jury the trial judge removed the conspiracy issue from the case when, in the course of discussing the forms of verdict with counsel, he stated that the clerk need prepare only two forms of verdict: one in favor of both plaintiffs against defendants and the other in favor of all defendants against both plaintiffs. The alleged error is predicated on the fact that the court nevertheless instructed the jury on conspiracy.

An examination of the record discloses that the colloquy between court and counsel was confined only to the forms of verdict; that the court did not indicate that the issue whether or not defendants accomplished a wrongful act by concert of action was to be removed from the jury or that the evidence relevant to such issue was not to be considered by them; and that during the colloquy defendants' counsel clearly indicated to the court, without evincing any objection, his understanding that the jury were to be given the two issues of fraud and conspiracy. After retiring to deliberate, the jury again returned into open court requesting that there be read to them: (a) the instructions on fraud and conspiracy; and (b) the charges in the complaint and defendants' answer thereto. At that time, in response to the court's inquiry of defendants' counsel as to what should be read, the latter stated that ''Your Honor should give them the instructions on conspiracy and fraud as requested. . . . And let it go at that, . . .''

The instructions thereafter given represent a correct statement of the law, the court carefully pointing out that ''Accurately speaking, there is no such thing as a civil action for conspiracy in and of itself''[24] and advising the jury on the

---

[24]The court's instructions are in harmony with our views in *Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64-65 [35 Cal.Rptr. 652].

subjects of concert of action and resulting damages. We find no error in incident complained of.

Finally we take up defendants' contention, raised for the first time in their closing brief, that the court erred in instructing the jury on the computation of damages.[25] "It is well settled that a point raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present such point before. [Citations.]" (*Duncanson-Harrelson Co.* v. *Travelers Indem. Co.* (1962) 209 Cal. App.2d 62, 70 [25 Cal.Rptr. 718]; *Travelers Indem. Co.* v. *Colonial Ins. Co.* (1966) 242 Cal.App.2d 227, 242 [51 Cal. Rptr. 724].) The point does not appear to have been raised on motion for new trial. Nor do defendants offer an explanation as to why they have reserved it until their closing brief. While we are under no obligation to consider it, we have decided to do so since we permitted discussion of the point at oral argument.

The contention need not detain us long. Defendants argue that the proper measure of damages is the fair market value of the property *less the cost of acquisition* and that the omission of the last factor from the instruction constitutes reversible error. They cite our opinion in *San Francisco Iron & Metal Co.* v. *American Milling & Industrial Co.* (1931) 115 Cal.App. 238 [1 P.2d 1008]. That case is distinguishable. There the plaintiff joint-venturer lost an option to purchase the property because of the failure of the defendant co-adventurer to cooperate in exercising the option. In the meantime, by secret negotiations, the defendant purchased the property with its own funds for its own account. Plaintiff's action was one for damages *for breach of contract*.

The present action sounds in tort, not in contract. Here plaintiffs elected to affirm the joint venture agreement, to consider it as terminated and repudiated by defendants and to seek damages for their fraud. (*Squire's Dept. Store, Inc.* v. *Dudum* (1953) 115 Cal.App.2d 320, 323 [252 P.2d 418].) As to cases like the instant one involving fraud of fiduciaries the

---

[25]The instruction complained of states: "If you should find from the evidence that the plaintiffs are entitled to a verdict, then in awarding compensatory or actual damages the measure of those damages is a sum equivalent to one-third of the fair market value of the so-called commercial and multiple-dwelling acreage, which was allegedly the subject of the joint venture agreement, that value to be determined as of on or about March 28, 1961."

much broader provisions of sections 3333[26] and 1709[27] of the Civil Code are applicable rather than the ''out of pocket'' rule codified in section 3343 covering a vendor-vendee relationship. (*Simone* v. *McKee* (1956) 142 Cal.App.2d 307, 315-316 [298 P.2d 667]; *Walsh* v. *Hooker & Fay* (1963) 212 Cal.App. 2d 450, 458-461 [28 Cal.Rptr. 16].) ▉ In connection with the instruction under consideration, the trial judge instructed the jury substantially in accordance with section 3333.[28] As we have explained, plaintiffs' theory of case was that defendants conspired to defraud them by acquiring for themselves exclusively the commercial and multi-dwelling acreages which was to have been the property of the joint venture. By its instructions therefore the court told the jury in effect that if they found in favor of plaintiffs, the latter were entitled to have the fair market value of that which was taken from them, namely their one-third interest in the joint venture property. We find no error in the giving of the instruction.[29]

The attempted appeal from the order denying defendants' motion for a new trial is dismissed. The judgment and the order denying defendants' motion for a judgment notwithstanding the verdict are affirmed.

Molinari, J., and Sims, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 8, 1967. Sullivan, J., did not participate therein.

---

[26]Civil Code section 3333 provides in pertinent part: ''For the breach of an obligation not arising from contract, the measure of damages, . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.''

[27]Civil Code section 1709 provides: ''One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.''

[28]Said instruction stated in part: ''There are two classes of damages in actions based on alleged fraud, namely, compensatory damages and exemplary or punitive damages. By compensatory damages I mean actual damages or such damages as will compensate a person for all the detriment or injury sustained by reason of and as the proximate result of the alleged fraud. . . .''

[29]In view of our conclusion, we need not consider defendants' argument that the remission of a portion of the judgment did not cure the alleged error in the instructions.